# United States Court of Appeals
## For the First Circuit

No. 05-2309

UNITED STATES OF AMERICA,

Appellee,

v.

EDWARD PIERRE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

Rodney S. Dowell, with whom Berman & Dowell was on brief, for appellant.
Theodore B. Heinrich, Assistant U.S. Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

April 18, 2007

**LYNCH**, **Circuit Judge**.  Defendant Edward Pierre ran an illegal wholesale and retail drug distribution business in Fall River, Massachusetts.

In 2003, Pierre was convicted of possessing cocaine with intent to distribute; the jury hung on a separate drug conspiracy count.  The conspiracy count was retried in 2004, and Pierre was convicted of conspiring to distribute crack cocaine and cocaine.  Pierre's co-defendant and ex-girlfriend, Michelle Mickens, pled guilty and testified against Pierre at both trials.  Pierre subsequently was sentenced to a 432-month term of imprisonment on the conspiracy charge, a 240-month term of imprisonment, which was to run concurrently, on the possession charge, and five years' supervised release.  The district court also entered a final order of forfeiture for $500,000 against Pierre.

Pierre's appeal relates primarily to the 2004 conspiracy conviction and the accompanying sentence, although he does assign error to the introduction of certain evidence at both the 2003 and 2004 trials and to his sentence on the possession count.  He also claims that the district court's forfeiture order was error.  On appeal, we reject his myriad claims of error and affirm his convictions, his combined sentence, and the forfeiture order.

## I.  Facts

Pierre and Mickens were indicted on August 15, 2002 for conspiring to distribute cocaine base.  On September 24, 2003, the

grand jury returned a second superceding indictment charging Pierre and Mickens with conspiring with others, from at least April 1998 until September 2001, to distribute fifty or more grams of crack and 500 or more grams of cocaine, and charging Pierre with possessing with intent to distribute 500 or more grams of cocaine on or about July 2, 2000. A forfeiture count sought criminal forfeiture of the proceeds of the conspiracy, including $500,000 and five pieces of jewelry. Mickens pled guilty, while Pierre went to trial. After a two-week trial in December 2003, a jury found Pierre guilty of the possession count, but found that the quantity of drugs was less than 500 grams. The jury was unable to reach a verdict on the conspiracy count. The conspiracy count was retried in April and May 2004, and a jury found Pierre guilty of the conspiracy count. In a special verdict form as to the forfeiture allegation, the jury found that at least $500,000 and a pair of diamond earrings were proceeds of the drug conspiracy.

The facts in evidence at the 2004 conspiracy trial fairly establish the following.

Pierre ran a drug business in Fall River from at least April 1998 to September 2001. During that time, Pierre obtained cocaine from a source in Brockton. He would then cook some of the cocaine into crack, and he would sell both crack and powder cocaine to customers in Fall River and New Bedford. Pierre did not have a driver's license, so he employed people to drive him back and forth

to Brockton and around Fall River.  In particular, Mickens testified at trial that she chauffeured Pierre, in addition to transporting drugs, collecting money, and selling crack for him. At the height of her involvement, Mickens made retail sales of up to $3000 worth of crack per night at Fall River bars and collected at least $1000 twice a week from Pierre's wholesale customers. Among Pierre's biggest wholesale customers were members of the 504 Boyz, a gang that sold crack around the Fifth Street area of Fall River.[1]

Mickens testified that Pierre used the proceeds of his drug operation to buy more drugs, to pay his living expenses and those of Mickens and the mother of his children, and to buy luxury items like expensive clothes and jewelry.  In addition, Pierre obtained at least seven cars for use in his drug business, all of which he registered to other people.  Mickens's testimony was corroborated by motel, bank, and motor vehicle records, and by the

---

[1]     Two members of the 504 Boyz testified at the 2003 trial. One member -- Nathaniel Fernandes -- testified on behalf of the government and offered evidence about the quantities of drugs that Pierre sold to the 504 Boyz.  Another member -- Henry Sanders -- was the sole witness for Pierre.  On direct examination, Sanders testified about a source other than Pierre who supplied drugs to the 504 Boyz.  On cross-examination, however, Sanders acknowledged that he had met Pierre many times when Pierre had come through the Fifth Street area to drop off drugs, and he also testified that from 1998 to 2001 Pierre was Fernandes's main source of supply. None of the 504 Boyz testified at the 2004 conspiracy trial.

testimony of Paula Costa, who bought crack from Pierre, and Fall River police officers.

## II.  Trial Error Claims

Pierre raises three claims of trial error and argues that each of the errors entitles him to a new trial.  First, Pierre argues that the district court constructively amended the indictment by admitting evidence of offenses not charged therein.  Next, he argues that in failing to suppress evidence of a particular drug seizure, the district court admitted evidence that violated Pierre's Fourth Amendment rights and that was unduly prejudicial and irrelevant.  Finally, Pierre argues that the district court impermissibly admitted prior bad acts evidence.

A.        <u>Constructive Amendment of the Indictment</u>

At both of Pierre's trials, Mickens and several Fall River police officers testified to an incident on April 14, 1998 at the Old Colony apartment complex, where Pierre then resided. Detective Michael Boutin testified that on that date he discovered a bag containing cocaine, a scale, and a bottle of inositol (a substance used to cut cocaine and crack) hidden behind a ceiling panel in the hallway of an Old Colony building.  He and other officers seized the items in the bag, replaced them with similar-looking items, and returned the bag to its hiding place.

The police officers then established surveillance at the site.  Officer Scott Paul testified that he saw Pierre emerge from

his apartment with a small step-ladder. Officer Alan Beausoliel testified that he saw Pierre approach the location of the hidden items. Although he could hear the ladder and ceiling tile being moved, Officer Beausoliel did not observe Pierre remove the bag from the ceiling. Officer Paul observed Pierre returning to his apartment with the step-ladder. He then heard a thud and running. Other officers spotted Pierre running out of the building and fleeing in a car. A fingerprint lifted from the bottle of inositol later was matched to Pierre.

Mickens corroborated this account. She testified that Pierre had told her that he had hidden cocaine and a scale in the ceiling of the building, and that when he returned to retrieve it, he noticed that a switch had been made. When he heard a noise and saw police, Pierre had run out of the building and fled in a car driven by an associate named Kennisen.

In addition, Detective Steven Washington testified that within the two weeks before the Old Colony incident he and two other officers had observed Pierre meeting with another individual by the name of Noel Lukenson.[2] The officers initially observed Lukenson and Pierre talking in a car parked on the street. Pierre then left, and after entering and exiting a nearby building,

---

[2] There seems to be some confusion over whether the individual's name is Noel Lukenson or Lukenson Noel. We refer to him hereafter as Lukenson.

Lukenson began crawling on the ground, took up a divot of grass, and removed a large white bag from underneath the divot. Lukenson then drove to Old Colony, picked up Pierre, and drove to two Fall River bars. At the first bar, a person entered the car and left within approximately two minutes. At the second bar, the officers observed Pierre meeting with another man; the man handed Pierre money, and Pierre then put his hand to his mouth, shook the other man's hand, and left.

Pierre argues that these two incidents were unrelated to the conspiracy charged in the indictment, and that by permitting testimony about them, the district court constructively amended the indictment. He argues that the indictment charged only a conspiracy between Pierre, Mickens, and the 504 Boyz. Pierre's position is that his supposed conspiracy with Mickens and the 504 Boyz had nothing to do with the Old Colony incident or with any agreement he might have had with Lukenson. Rather, he argues, these incidents were evidence of an independent, uncharged conspiracy. In particular, he emphasizes that Mickens did not know Lukenson, and that there was no evidence connecting the 504 Boyz to Lukenson. He argues that there is a possibility that his conviction "rests upon an offense not charged by the grand jury," and that as a result he is entitled to reversal of his conviction. United States v. Dunn, 758 F.2d 30, 36 (1st Cir. 1985).

The government argues that Pierre has not preserved his constructive amendment claim, and that our review is only for plain error.  See United States v. DeCicco, 439 F.3d 36, 44-45 (1st Cir. 2006).  We bypass the forfeiture issue and rule on the merits.

Constructive amendment of an indictment is prohibited in order "to preserve the right of the person accused of a[] . . . crime to have a grand jury vote on an indictment, to prevent reprosecution for the same offense, and to protect the right of the accused to be informed of the charges." United States v. Vavlitis, 9 F.3d 206, 210 (1st Cir. 1993).  "A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them." United States v. Fisher, 3 F.3d 456, 462 (1st Cir. 1993) (quoting Dunn, 758 F.2d at 35) (internal quotation marks omitted).  When the facts proved at trial differ from those alleged in the indictment, the indictment has been constructively amended.  Id.  Constructive amendment is per se prejudicial and is grounds for reversal of a conviction.  Dunn, 758 F.2d at 35.

> The second superceding indictment charged that
>
>> [f]rom a time unknown to the Grand Jury, but at least by in or about April of 1998, and continuing thereafter until September of 2001, in the District of Massachusetts and elsewhere, . . . PIERRE . . . did knowingly and intentionally conspire and agree with [Mickens and] others known and unknown to the Grand Jury[] to distribute 50 grams or more of

> a mixture or substance which contains a
> detectable amount of cocaine base, also known
> as "crack," and to distribute more than 500
> grams of cocaine.

The plain language of the indictment encompasses the Old Colony incident and the activities with Lukenson, which took place in April 1998. See id. at 37. It does not limit the charged conspiracy to the 504 Boyz. Further, evidence of the Lukenson incident was presented to the Grand Jury that returned the indictment.

We find no support in the record for Pierre's argument that the government's "primary theory of the case was that Pierre and Mickens conspired together and with the 504 Boyz to distribute cocaine," or his contention that the government switched theories in the 2004 trial. The government presented the Lukenson evidence to the Grand Jury and the Old Colony evidence at the 2003 trial. The prosecution theory all along was that Pierre conspired with many people, including Lukenson and women other than Mickens.

Nor did the evidence presented at the 2004 trial necessarily show two distinct conspiracies, as Pierre argues. Contrary to Pierre's suggestion, there is no requirement that all of the participants in a conspiracy know or even know of one another. United States v. Fenton, 367 F.3d 14, 19 (1st Cir. 2004). The test for determining whether a single agreement existed among co-conspirators is a pragmatic one, taking into account the totality of the circumstances. Id.

The evidence at the 2004 trial showed continuity between the two time periods at issue -- April 1998, when the Lukenson and Old Colony events took place, and the summer of 1999, when Mickens began a relationship with Pierre. See United States v. David, 940 F.2d 722, 734 (1st Cir. 1991). Mickens testified that Pierre told her about the Old Colony incident, and that he told her he fled in a car driven by a man named Kennisen. She testified that she knew Kennisen because Pierre regularly directed her to collect money from him and because she frequently drove Pierre to New Bedford to meet with Kennisen.[3] Likewise, Mickens testified that when she arrived in Fall River in 1998, Pierre had an ongoing relationship with the 504 Boyz.

The evidence also showed that Pierre's business operated in the same way and to the same end in April 1998 as it did during Mickens's later involvement. See id. The Old Colony and Lukenson evidence demonstrated that in April 1998 Pierre used other people to drive him around, hid his drugs in public spaces and outdoors, cut his drugs with inositol, and sold his drugs at Fall River bars. Mickens's testimony was that during the time she was involved with Pierre's business, he used other people to drive him around, often

---

[3] There was testimony suggesting that Pierre fled in Lukenson's car, although no one observed the driver of the car. "Lukenson" and "Kennisen" are phonetically similar, and it is possible that the two names refer to the same person. Regardless, Mickens's testimony was that she knew the person who drove the car from the Old Colony incident, and that he was still involved when she joined the drug operation.

hid his drugs outdoors in holes in the ground, cut his drugs with inositol, and sold his drugs at Fall River bars.

The facts proved at trial were more than adequate to prove one ongoing conspiracy, with Pierre at the center. See Fenton, 367 F.3d at 19-20. There was no constructive amendment. Dunn, 758 F.2d at 38; see also United States v. Kelly, 722 F.2d 873, 876 (1st Cir. 1983).

B.      Drug Seizure Evidence

On February 21, 2001, Pierre was driving in a convenience store parking lot when he was stopped by Fall River Police Officer David Murphy. Officer Murphy later testified that he stopped Pierre because he "was aware at the time [that Pierre] did not have an active license." After confirming that Pierre's license had been suspended, Officer Murphy arrested Pierre for driving with a suspended license. Pierre was taken to the Fall River Police Department where he was searched as part of the booking process. During the search, police officers recovered cocaine from Pierre's pocket.

Pierre filed a motion to suppress the February 21 traffic stop evidence, arguing that Officer Murphy did not have reasonable suspicion to stop Pierre. The district court denied the motion after an evidentiary hearing. The court found that Pierre had reasonable suspicion to stop Pierre for driving without a license. The cocaine seized during the traffic stop was admitted at both the

2003 and 2004 trials. Pierre argues that the information on which Officer Murphy based the traffic stop was stale, and that introduction of the seized cocaine therefore violated his Fourth Amendment rights.

We review the district court's ultimate determination of reasonable suspicion on a motion to suppress de novo. United States v. Capelton, 350 F.3d 231, 240 (1st Cir. 2003). We review subsidiary factual findings for clear error. Id.

A traffic stop constitutes a seizure within the meaning of the Fourth Amendment. United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001). As a result, "the stop must be supported by a reasonable and articulable suspicion of criminal activity." Id. at 6. Reasonable suspicion requires more than a naked hunch that criminal activity is afoot, but less than probable cause. Id. Its existence is assessed on a case-by-case basis, in light of all the attendant circumstances. Id. When evaluating a claim of staleness, courts do not measure the timeliness of information simply by counting the number of days that have elapsed. United States v. Bucuvalas, 970 F.2d 937, 940 (1st Cir. 1992), abrogated on other grounds by Cleveland v. United States, 531 U.S. 12 (2000). Rather, a court must assess the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information. Cf. id.

At the suppression hearing, Officer Murphy testified that from September 1999 to September 2000 he had worked in the vice and intelligence unit of the Fall River Police Department. During that time, Pierre's name came up often in conversation; fellow officers frequently discussed his drug dealing, and Officer Murphy was informed that Pierre did not have an active license. Officer Murphy testified that after he left the vice unit, he continued to talk with detectives there regarding Pierre, and no one ever informed him that Pierre's license status had changed.

Pierre relies on United States v. Laughrin, 438 F.3d 1245 (10th Cir. 2006), a Tenth Circuit case, to argue that Officer Murphy's information (from the time he served in the vice unit) was so old as to be meaningless, and therefore could not justify a traffic stop. Laughrin, however, is distinguishable. In that case, a police officer had stopped the defendant based on his knowledge, which was at least twenty-two weeks old, of the defendant's driving record. Id. at 1246-47. The officer previously had stopped the defendant when he was driving on a suspended license, but the court noted that there was no indication from the officer's testimony about the length of the license suspension. Id. at 1248. The court stated that if there had been testimony about the length of the suspension, the court might have been able to affirm the finding of reasonable suspicion. Id. In

-13-

the absence of such testimony, however, it held that the officer's information was too stale to justify the stop. Id.

Here, however, Officer Murphy offered testimony indicating that Pierre's license had been suspended during the entire year that Officer Murphy had served in the vice unit. This testimony suggests that Pierre's license was suspended on an ongoing basis, rather than for a short period of time, making the suspicion that it was still inactive some five months later more reasonable. Moreover, Officer Murphy testified that he kept in touch with some of the detectives in the vice unit, and that none of those detectives ever informed him during conversations about Pierre of any change in Pierre's license status. Although he did not explicitly state as much, the import of Officer Murphy's testimony was that because Pierre's license status was relevant to future investigations and cases, he would have expected someone to have informed him if Pierre's license status had changed. We hold that Officer Murphy had reasonable suspicion to stop Pierre's car, and that the district court did not err in failing to suppress the cocaine seized incident to Pierre's arrest.

Pierre cursorily states that the February 21 evidence was irrelevant and unduly prejudicial. See Fed. R. Evid. 403. This argument has been waived, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed

waived."), and is without merit in any event. Evidence that Pierre was driving without a license served to corroborate Mickens's testimony that Pierre did not have a license and employed people to drive him around. Likewise, evidence that Pierre was carrying cocaine when he was stopped in February 2001 is directly relevant to his participation in a drug distribution conspiracy between April 1998 and September 2001.

C.        Prior Bad Acts Evidence

Pierre argues that the Old Colony, Lukenson, and February 21 traffic stop testimony should not have been admitted because it was evidence of prior bad acts. See Fed. R. Evid. 404(b); id. 403. He also argues that during the 2003 trial, Officer Alan Correiro, who appeared on behalf of the government, testified about an uncharged shooting "in an attempt to prejudice the jury concerning the character of Pierre." The district court's determination that evidence is not precluded by Federal Rules of Evidence 403 or 404(b) is reviewed for abuse of discretion. United States v. Frankhauser, 80 F.3d 641, 648 (1st Cir. 1996).

Our conclusion that the Old Colony, Lukenson, and February 21 traffic stop evidence was proof of the conspiracy charged in the indictment defeats the prior bad acts argument as to that evidence. See United States v. Arboleda, 929 F.2d 858, 866 (1st Cir. 1991). Moreover, none of this evidence was unduly prejudicial. See id. at 866-67.

As to the Correiro testimony, it was a minor issue that was fully remedied by the district court. Correiro was called to testify about drug-related statements that Pierre made to him in October 2000. When questioned about an omission in his report, Correiro explained that the initial report was not about drugs because the investigation was of "a shooting incident." Defense counsel objected, and the district court instructed the jury to disregard the answer. During cross-examination, Correiro again referred to the incident and stated that charges had been brought against Pierre. Defense counsel then moved for a mistrial, which the district court denied, and the court instructed the jury more forcefully that the shooting incident had nothing to do with the case before them, that the charges against Pierre had been dismissed, and that they should not think or talk about the incident. "We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it." Greer v. Miller, 483 U.S. 756, 766 n.8 (1987). Only if there is an overwhelming probability that the jury could not have followed the instruction and a strong likelihood that the evidence was devastating to the defendant will we assume otherwise. Id. This is not such a case.

## III. Forfeiture-Related Claim

Pierre argues that the forfeiture order was error because the government failed to demonstrate that he earned $500,000 as a

result of the conspiracy for which he was convicted. He further argues that the government was improperly permitted to seize substitute assets prior to the 2003 trial.

A.          Sufficiency of the Evidence

Following the guilty verdict at the 2004 trial, the jury returned a special verdict in which it found that at least $500,000 and a pair of diamond earrings seized by the government were "derived, directly or indirectly," from the conspiracy.[4] A forfeiture verdict must be supported by a preponderance of the evidence. United States v. Keene, 341 F.3d 78, 86 (1st Cir. 2003); United States v. Rogers, 102 F.3d 641, 648 (1st Cir. 1996). We have no problem finding a sufficient evidentiary basis for the jury's verdict here.

The evidence in support of the forfeiture verdict at the 2004 trial included Mickens's testimony, as well as several records documenting expenditures by Pierre. Mickens testified that from the time she moved to Fall River in 1998 until she developed a relationship with Pierre the following year, she saw Pierre exchanging money with others in various locations. She further testified that during the period of her involvement with Pierre -- from summer 1999 until her arrest in September 2001 -- Pierre

_____

[4]    Pierre does not contest the forfeitability of the earrings.

-17-

admitted to her that he had been in the drug business for years, and she observed Pierre regularly obtain cocaine from a source in Brockton and sell crack to customers in Fall River and New Bedford. Mickens testified that she drove Pierre to his source in Brockton "[q]uite a bit," "once a week, twice a week, sometimes more," and that she drove Pierre around Fall River "[j]ust about every day" so that he could "collect money or drop off ounces." She also testified that she sold crack for Pierre, and at the height of her involvement she sold up to $3000 worth of crack per night; she further indicated that if Pierre did not need her to drive him around, she "was in the bar [selling drugs] from the time they opened, all day." Mickens also stated that she collected at least $1000 two times per week from Pierre's biggest wholesale customers, and that Pierre also collected money from them. Finally, Mickens testified that she observed Pierre cook up part of a half-kilogram of cocaine that he had obtained in Florida.

The documentary evidence presented by the government showed that during the course of the conspiracy Pierre spent over $6000 on motel rooms, over $22,000 on cars, and deposited and withdrew nearly $40,000 from a bank account. He also spent at least $4700 on jewelry. Finally, he paid the living expenses of Mickens, totaling over $12,000 per year, and the expenses of his children and their mother. Mickens testified that Pierre had no job other than drug dealing. At the time Mickens met Pierre, he

-18-

did have a used car lot, but Mickens testified that he used the car lot to deal drugs and sold only one or two cars before getting rid of the lot a couple of months after she had met him.

Although one cannot, based on this testimony and documentary evidence, tally specific amounts to arrive at $500,000, the government may satisfy its burden of proof by either direct or circumstantial evidence. United States v. Houlihan, 92 F.3d 1271, 1299 (1st Cir. 1996). From the time of her involvement in 1999, Mickens estimated that she earned or collected between $3400 and over $20,000 per week in drug money for Pierre. The jury could easily have inferred from the evidence presented that on average Pierre sold at least $3000 worth of cocaine or crack each week over the life of the conspiracy. Such an inference supports the jury's finding that $500,000 was forfeitable.

B.       Substitute Assets

When Pierre was arrested, the government seized from him various pieces of jewelry -- including a watch, necklace, ring, bracelet, and earrings -- subsequently valued at over $60,000. It then began administrative forfeiture proceedings, but when Pierre filed a motion contesting the forfeiture, the government abandoned the claim. Pierre's motion also requested immediate return of the jewelry, but the government refused to return the jewelry to Pierre, stating that it was evidence of criminal activity. See Fed. R. Crim. P. 41(g) (providing that the district court "may

-19-

impose reasonable conditions to protect access to [seized] property and its use in later proceedings").  The district court agreed that the government was permitted to retain possession of the jewelry as evidence and denied Pierre's motion requesting return of the jewelry.

On September 24, 2003, the government obtained a second superceding indictment that included a forfeiture allegation specifying the seized jewelry and $500,000 as forfeitable.  At the 2003 trial, Fernandes testified that Pierre had spent money on gold chains and a jeweled bracelet, and the government offered the jewelry into evidence without objection.  Prior to the 2004 trial, however, Pierre challenged the admissibility of the jewelry, arguing that the government was unable to tie it to the alleged conspiracy.  The district court granted Pierre's motion to exclude the jewelry from the 2004 trial, except for the pair of earrings, which Mickens testified Pierre purchased for himself during their relationship.  Defense counsel then took possession of the excluded jewelry.

After the jury in the 2004 trial returned a special verdict finding that $500,000 and the earrings were forfeitable, the district court entered a preliminary order forfeiting the earrings and the other four pieces of jewelry as substitute assets, 21 U.S.C. § 853(p), since the government was unable to locate the $500,000 specified in the special verdict.  See United States v.

Hall, 434 F.3d 42, 58 n.7 (1st Cir. 2006) ("Substitute property may be seized by the government to satisfy a forfeiture order where, by an act or omission, the defendant has prevented the government from tracing his illegally obtained assets."). Nine months later, the district court entered a final order of forfeiture, forfeiting the earrings and the substitute assets.

Pierre does not object to the forfeiture of the four pieces of jewelry as substitute assets, but rather to the district court's having permitted the government to retain possession of them prior to the 2003 trial. As a remedy, he seeks to have the jewelry (or its monetary equivalent) returned to him now. We review the district court's interpretation of Rule 41(g) de novo. See United States v. Dean, 100 F.3d 19, 20 (5th Cir. 1996). The district court's factual determination that the jewelry had evidentiary value to the government is reviewed for clear error. See id.

Rule 41(g) provides that "[a] person aggrieved . . . by the deprivation of property may move [the district court] for the property's return." Once seized property is no longer needed as evidence, a criminal defendant is presumed to have the right to its return. See Dean, 100 F.3d at 20; United States v. Mills, 991 F.2d 609, 612 (9th Cir. 1993). However, "[a] Rule 41[(g)] motion is properly denied 'if the defendant is not entitled to lawful possession of the seized property, the property is contraband or

-21-

subject to forfeiture[,] or the government's need for the property as evidence continues.'" Mills, 991 F.2d at 612 (quoting United States v. Van Cauwenberghe, 934 F.2d 1048, 1061 (9th Cir. 1991)); see also United States v. Saunders, 957 F.2d 1488, 1495 (8th Cir. 1992) (holding that "[t]he motion for the return of the paperwork, even papers that were not introduced at trial, was premature because defendant's direct appeal was still pending"); Van Cauwenberghe, 934 F.2d at 1061 (holding that a defendant's motion for the return of property may be denied based on the government's need for the property as evidence).

The district court's finding that the jewelry had evidentiary value to the government was not clearly erroneous. The government introduced the seized jewelry into evidence at the 2003 trial and presented testimony attempting to link the jewelry to the proceeds of the charged conspiracy. Once it became clear that the government's evidence on this point was not particularly strong, the district court granted Pierre's motion to exclude four pieces of the jewelry, and defense counsel took possession of those pieces at that time.

Moreover, even if the district court's order permitting the government to retain possession of the jewelry before the 2003 trial was in error, Pierre still would not be entitled to return of the jewelry now. An illegal seizure of property does not immunize it from forfeiture as long as the government can sustain the

forfeiture claim with independent evidence. United States v. Rogers, 102 F.3d 641, 648 (1st Cir. 1996) (rejecting a claim that property illegally seized by law enforcement officers was not forfeitable). The cases cited by Pierre in support of his argument that the jewelry must be returned do not suggest otherwise. Rather, the remedy in each of those cases was to affirm the denial of or vacate the grant of a pre-trial restraining order as to substitute assets. United States v. Gotti, 155 F.3d 144, 146, 150 (2d Cir. 1998); United States v. Field, 62 F.3d 246, 247-48, 250 (8th Cir. 1995); In re Assets of Martin, 1 F.3d 1351, 1354, 1362 (3d Cir. 1993); United States v. Floyd, 992 F.2d 498, 498-99 (5th Cir. 1993).

The forfeiture of the jewelry was not erroneous.

### IV.  Sentencing Error Claims

Pierre raises four claims of sentencing error. He argues that the district court improperly calculated his base offense level with respect to drug quantity and improperly applied a four-level enhancement for leadership of extensive criminal activity. He also argues that his sentence on the conspiracy count is unreasonable as a matter of law because of disparities with sentences imposed on other participants in the conspiracy. Finally, he argues that his sentence on the possession count is unreasonable because it exceeds the Guidelines range (although not the statutory maximum) for that count.

-23-

We review de novo sentencing issues involving questions of law.  United States v. McCarthy, 77 F.3d 522, 535 (1st Cir. 1996).  We review the district court's determination of the reliability of sentencing information for abuse of discretion.  United States v. Luciano, 414 F.3d 174, 180 (1st Cir. 2005).  Factual determinations are reviewed for clear error.  Id.

A.        Drug Quantity

At sentencing, the district court found that Pierre was responsible for 1.5 kilograms or more of cocaine base, and that the appropriate base offense level therefore was 38.  Pierre argues that this finding was unsupported by either of the jury verdicts (one of which found that he did not, on a particular occasion, possess 500 or more grams of cocaine but rather possessed a lesser amount, and one of which found that he was responsible over the course of the conspiracy for 50 grams or more of crack and 500 grams or more of powder cocaine), and that it therefore infringed on his Fifth Amendment due process and Sixth Amendment jury trial rights.

Our prior caselaw forecloses any such argument.  See United States v. Yeje-Cabrera, 430 F.3d 1, 17-18 (1st Cir. 2005) ("Since Booker we have made it clear that the district courts may make drug quantity determinations for sentencing purposes . . . .");  United States v. Pérez-Ruiz, 421 F.3d 11, 14-15 (1st Cir. 2005) (rejecting the claim that "the district judge violated

-24-

the Sixth Amendment by himself making the determinations as to drug quantity and other enhancements").

To the extent Pierre argues that there was insufficient evidence to support the district court's drug quantity finding,[5] the argument fails. At Pierre's first trial, in 2003, Fernandes testified that Pierre supplied the 504 Boyz with half a kilogram of crack every month for two years. At the sentencing hearing, the district court specifically commented on Fernandes's credibility and concluded that he was "credible in [his] testimony about the drug quantity." This credibility determination was not an abuse of discretion, see Luciano, 414 F.3d at 180, and Fernandes's testimony amply supports the court's drug quantity finding. There was thus no clear error in the district court's drug quantity determination. See id.

B.    Leadership Enhancement

Pierre makes similar objections to the district court's imposition of a four-level enhancement for leadership of extensive criminal activity. He argues first that no jury verdict established that he was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," U.S.S.G. § 3B1.1(a), and that imposition of the enhancement therefore was improper. He next argues that the

---

[5]    It is not at all clear that Pierre makes any such argument. See Zannino, 895 F.2d at 17.

evidence was insufficient to establish that he was a leader of extensive criminal activity, even by a preponderance of the evidence.

There is no requirement that the jury find that the leadership enhancement applies. "Under the advisory guidelines regime, the district court can use the preponderance of the evidence standard to determine whether an enhancement applies." United States v. Holliday, 457 F.3d 121, 130 (1st Cir. 2006).

We review the district court's "factbound" determination that Pierre was a leader for clear error. United States v. Ventura, 353 F.3d 84, 89 (1st Cir. 2003). The district court stated that it based its determination that Pierre was a leader of extensive criminal activity on "the number of people involved, the number of places in which drugs were sold, . . . the fact that drugs were sold both at the wholesale level and at the retail level, . . . and at the center of all this is Mr. Pierre." The district court also mentioned the quantity of drugs involved and the period of time over which the drug business extended as factors contributing to its conclusion. The record bears out the district court's conclusion. There was testimony that a number of different people assisted Pierre with his drug operations; that Pierre made wholesale drug sales to groups like the 504 Boyz, as well as retail sales at bars in and around Fall River; that Pierre's business

-26-

involved significant quantities of drugs; and that it extended over a period of at least three years.

The district court's application of the leadership enhancement thus was not clearly erroneous. See United States v. Colón-Muñoz, 318 F.3d 348, 364 (1st Cir. 2003) (noting that the extent of criminal activity within the meaning of U.S.S.G. § 3B1.1 is assessed based on "the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme" (quoting United States v. Dietz, 950 F.2d 50, 53 (1st Cir. 1991)) (internal quotation marks omitted)).

C.        Reasonableness

Pierre argues that his 432-month sentence on the conspiracy count is unreasonable as a matter of law.[6] See United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006) (en banc), cert. denied, 127 S. Ct. 928 (2007); see also 18 U.S.C. § 3553(a). He bases this argument on the fact that his sentence is over three times as long as that imposed on any other member of the conspiracy. He makes a related argument that the district court failed to explain adequately the reasons why his sentence is so much longer than his co-conspirators' sentences.

---

[6]    The district court calculated Pierre's Guidelines range on the conspiracy count to be 360 months to life.

Pierre fails to present us with any evidence that he is similarly situated to other members of the conspiracy and so therefore arguably should have received a comparable sentence. Our review of the evidence indicates quite the contrary -- that Pierre was not similarly situated to other members of the conspiracy. For example, Pierre is not similarly situated to Mickens, who reported to and took orders from Pierre. Mickens testified that Pierre beat her on a number of occasions, that he threatened to kill her, and that he forced her to have sex with other men while he watched. Likewise, Pierre's criminal history included incidents that distinguished him from his co-conspirators. Pierre's pre-sentence report, which included information from the grand jury investigation that had been excluded at trial, stated that Pierre previously had been convicted of threatening to kill a former girlfriend and "cut up her face and dump her body." Moreover, both Mickens and Fernandes pled guilty and provided substantial assistance to the government. A defendant's sentence is not "unreasonable simply because his co-defendants agreed to help the government in exchange for reduced sentences." United States v. Vázquez-Rivera, 470 F.3d 443, 449 (1st Cir. 2006); see also United States v. Saez, 444 F.3d 15, 18 (1st Cir. 2006), cert. denied, 127 S. Ct. 224 (2006). Finally, all of the participants in the

conspiracy except for Mickens were sentenced by a different judge from the one who sentenced Pierre.[7]  See Saez, 444 F.3d at 19.

The district court explained its reasons for imposing the sentence that it did.  The court repeatedly expressed disappointment that Pierre, in his statement to the court, refused to take any responsibility for the situation in which he found himself and failed to express any remorse for his actions.  In its Statement of Reasons, the court wrote that it viewed Pierre as "an unrepentant and dangerous dealer in illicit drugs and firearms." It explained that it found a sentence of 432 months "sufficient to punish [Pierre] and  to deter him and others from similar conduct," while still preserving the possibility that Pierre would "have some period of freedom in the sunset of his life."

Although the district court did not explicitly state why it imposed on Pierre a sentence much more substantial than those received by other members of the conspiracy, we can infer its reasoning "by comparing what was argued by the parties . . . with what the [court] did."  Jiménez-Beltre, 440 F.3d at 519.  Pierre argued in his sentencing memorandum and at his sentencing hearing that he should receive a sentence no greater than that imposed on

---

[7]     We further note that Congress's aim in enacting 18 U.S.C. § 3553(a)(6), which directs the sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," "almost certainly" was to reduce unwarranted disparities in sentencing on a national level.  Saez, 444 F.3d at 18.

-29-

his co-conspirators. The district court rejected this argument and, having found that Pierre was a dangerous and unrepentant criminal, sentenced Pierre within the Guidelines range.

Pierre's sentence on the conspiracy count is reasonable and is adequately explained. See Saez, 444 F.3d at 17.

D.        Sentence on Possession Count

Because Pierre was sentenced to serve concurrent sentences,[8] he was not prejudiced by any error he alleges with respect to the possession count. See United States v. Ziskind, 471 F.3d 266, 271 (1st Cir. 2006); see also United States v. Dominguez Benitez, 542 U.S. 74, 81-82 (2004) ("[R]elief for error is tied in some way to prejudicial effect . . . [and requires a] showing of 'a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different.'" (third alteration in original) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.))). His 240-month sentence on the possession count runs concurrently with his 432-month sentence on the conspiracy count.

---

[8]    "[I]n the usual case, at least one count in a multiple-count indictment will be able to accommodate the total punishment for the offenses of conviction . . . . [W]hen that is so, '[t]he sentence on each of the other counts will then be set at the lesser of the total punishment and the applicable statutory maximum, and be made to run concurrently with all or part of the longest sentence.'" United States v. Quinones, 26 F.3d 213, 215-16 (1st Cir. 1994) (third alteration in original) (quoting U.S.S.G. § 5G1.2 comment).

Pierre's convictions, his combined sentence, and the forfeiture order entered against him are <u>affirmed</u>.