# United States Court of Appeals
## For the First Circuit

No. 07-1979

UNITED STATES,

Appellee,

v.

FRANK ARBOUR,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Torruella, Lipez and Howard,
Circuit Judges.

Jonathan G. Mermin, with whom Preti, Flaherty, Beliveau & Pachios, LLP, was on brief for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.

March 12, 2009

**HOWARD**, **Circuit Judge**. Appellant Frank Arbour pled guilty to five counts in an indictment that charged him with conspiring to possess with the intent to distribute cocaine and cocaine base, 21 U.S.C. § 841(a)(1); being a felon in possession of firearms, 18 U.S.C. § 922(g)(1); and possessing stolen firearms, 18 U.S.C. § 922(j). The district court sentenced Arbour to 100 months' imprisonment. He appeals his sentence only.

This case presents one issue: whether the sentencing court erroneously concluded that Arbour was a "leader or organizer" of a criminal activity that involved five or more participants or was otherwise extensive. See U.S.S.G. § 3B1.1(a). The district court's affirmative finding resulted in a four-level increase in Arbour's offense level.

Arbour argues that the district court's conclusion was erroneous for two reasons. First, he asserts that he was not involved in a single criminal activity but rather in a number of separate, unconnected criminal activities. None of these criminal activities standing alone, Arbour says, satisfy § 3B1.1(a)'s requirement that the criminal activity involve five or more participants or be "otherwise extensive." Second, he argues that even if he was involved in a single criminal activity that satisfied § 3B1.1(a)'s numerosity or extensiveness requirement, he could not be properly characterized as a leader or organizer of

five participants in the criminal activity.  We disagree with Arbour's contentions and affirm his sentence.

## I.  **Facts**

Because Arbour's conviction resulted from a guilty plea, we draw the facts from the plea colloquy, the Presentence Investigation Report and the transcript of the sentencing hearing. See United States v. Graciani, 61 F.3d 70, 72 (1st Cir. 1995).

For a period of roughly eighteen months, Arbour trafficked in powder cocaine and crack cocaine in Maine.  Arbour supplied a number of individuals with drugs for purposes of both resale and consumption.  Included among these individuals was Roy Dubreil, who sold both forms of cocaine to others, often from his home.  At some point, Arbour moved in with Dubreil.

While Arbour was operating his drug trafficking business, he collected a number of firearms.  Because he was a convicted felon, Arbour was prohibited from purchasing the firearms himself and therefore he enlisted three others to purchase the weapons for him.  Two of these straw men, John Jackson and John Giannelli, were familiar to Arbour from his drug trafficking business. Jackson was one of Arbour's customers and also occasionally delivered drugs for Arbour.  Giannelli frequently bought drugs from Dubreil.  For their services in purchasing firearms for him, Arbour paid both Jackson and Giannelli with drugs.  Arbour paid Baron Thompson, a third person he enlisted to purchase firearms, in cash.

The three ersatz buyers acquired a total of six firearms from a hardware store in Maine. Thompson alone purchased three firearms. Unable to purchase firearms himself because of his age, Jackson acquired two weapons indirectly, by enlisting a woman of age, Crystal Landry, to purchase the firearms for him. Arbour was directly involved in Giannelli's purchase from the hardware store, accompanying Giannelli to the store and discretely identifying the firearm he desired.[1]

The firearms that Thompson, Jackson and Giannelli acquired for Arbour soon left Arbour's possession. Giannelli testified that, on the date of his purchase of the weapon, he witnessed a number of people from out of state arrive at Dubreil's home. According to Giannelli, the visitors supplied Arbour with drugs from Massachusetts, receiving money or "goods" in exchange. Giannelli observed the men going into a room with Arbour and Dubreil. Afterward, when Giannelli asked Dubreil where the firearm he had purchased for Arbour was, Dubreil told him that it was "already gone." Of the three weapons Thompson had purchased, two of them were discovered in the possession of a Massachusetts resident during a search of that person's home by law enforcement. That individual was also in the possession of seventy bags of

---

[1] Thompson, Jackson, Landry and Giannelli were all convicted of various firearms offenses for their roles in these purchases.

cocaine. The firearms acquired by Jackson and Landry were never found, either in Arbour's possession or anywhere else.

Eventually, the authorities investigated Arbour's drug trafficking operation, ultimately searching Arbour's and Dubreil's residence. In Arbour's room, the police discovered bedroom scales, plastic baggies with cocaine residue, three firearms, and ammunition. In Dubreil's room the authorities found ten firearms and ammunition. Many of the firearms had been stolen, including the three firearms found in Arbour's bedroom. Arbour subsequently pled guilty to five drug and firearms related charges.

At Arbour's sentencing hearing, a number of witnesses testified about his drug trafficking business and acquisition of firearms. In addition to this testimony, defense counsel conceded at sentencing that Arbour had traded guns for cocaine on at least one occasion.

On the basis of sentencing hearing testimony and other record evidence, the district court determined that Arbour was a leader or organizer of a criminal activity that involved five or more participants or was otherwise extensive. See § 3B1.1(a). Although the court explicitly found that Arbour's criminal activity involved five or more participants, the court also observed that the criminal activity involved both Arbour's drug dealing and his illegal acquisition of firearms. The district court also found that Arbour held a leadership or organizational role within the

criminal activity. When discussing Arbour's status as a leader or organizer, the court addressed the factors set forth in application note four of the guidelines commentary accompanying § 3B1.1(a). See § 3B1.1, cmt. n.4. Although the court observed that not every factor counseled in favor of designating Arbour as a leader or organizer, it found that many of them supported such a designation. In addition to noting the nature of Arbour's participation in the commission of the offenses, the court found that Arbour recruited accomplices and exercised decision-making authority over both Jackson and Giannelli.

## II.  Discussion

In order to invoke § 3B1.1(a), a district court must make a finding as to scope -- that the criminal activity involved five or more participants[2] or was otherwise extensive -- and a finding as to status -- that the defendant acted as an organizer and leader of the criminal activity. United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995). The district court's findings must satisfy the preponderance of the evidence standard. United States v. Pierre, 484 F.3d 75, 89 (1st Cir. 2007).

Arbour challenges both the scope and status findings of the district court. Because both findings are factbound, we review each for clear error. Pierre, 484 F.3d at 89; United States v.

---

[2] "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." § 3B1.1, cmt. n.1.

Colón-Muñoz, 318 F.3d 348, 364 (1st Cir. 2003) ("Role-in-the-offense determinations are innately fact-specific. The court of appeals must, therefore, pay heed to the sentencing judge's views.") (quoting United States v. Rostoff, 53 F.3d 398, 413 (1st Cir. 1995)). We will not find clear error unless "'on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed.'" United States v. Brown, 298 F.3d 120, 122 (1st Cir. 2002) (quoting Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1986)).

### A.   Scope determination

Arbour argues that he was not involved in a single criminal activity that involved five or more participants or was otherwise extensive. Rather, he contends that he was involved in four separate clusters of criminal activity, none of which individually met § 3B1.1(a)'s numerosity or extensiveness requirement. Arbour identifies these four clusters by their direct participants: 1) Arbour, Jackson, and Landry; 2) Arbour, Giannelli and Jeremy Messer; 3) Arbour and Thompson; and 4) Arbour, Giannelli, Dubreil, and Dean James.[3] In Arbour's view, each group was associated with separate instances of criminal activity -- the

---

[3] The government introduced evidence that Messer had asked Giannelli to purchase a firearm for Arbour and may have accompanied Arbour and Giannelli to the hardware store when the purchase was made. James helped collect money for Arbour that related to stolen cocaine.

-7-

first three were involved in the procurement of firearms and the fourth, in drug trafficking.

For § 3B1.1(a) to apply, the criminal activity that the defendant led or organized must have involved five or more participants or been extensive. § 3B1.1(a). The disjunctive language of § 3B1.1(a) is important -- a criminal activity may be extensive even if does not involve five or more participants. Id. cmt. n.3 ("In assessing whether [a criminal activity] is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."); see also United States v. Laboy, 351 F.3d 578, 585 n.10 (1st Cir. 2003) ("The 'five or more participants' and 'otherwise extensive' elements are alternative means of finding the required scope under § 3B1.1."); United States v. D'Andrea, 107 F.3d 949, 957 (1st Cir. 1997) (citing Rostoff, 53 F.3d at 413).

In addition, a court may look beyond the specific crimes for which the defendant was convicted when determining whether the criminal activity satisfied the numerosity or extensiveness requirement. Laboy, 351 F.3d at 585-86. The court may consider all "relevant conduct" surrounding the crimes of conviction. Id. at 586 (rejecting defendant's argument that the assessment was limited to the people directly involved in the three drug sales to

-8-

which the defendant pled guilty when making the numerosity/extensiveness determination).

Here, the district court did not commit clear error when it found that Arbour was involved in a criminal activity that involved five or more participants or was otherwise extensive. Although the court found that Arbour's criminal activity met both the numerosity and extensiveness requirements of § 3B1.1(a), we focus on the extensiveness component.

When determining whether a criminal activity is extensive, we have noted that courts should consider "the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme." Pierre, 484 F.3d at 89 (quoting United States v. Dietz, 950 F.2d 50, 53 (1st Cir. 1991)). Arbour was involved in an extensive criminal activity -- the trade of drugs for firearms and vice-versa -- that involved a host of knowing and unknowing participants. This overarching activity encompassed all of the four clusters of criminal activity that Arbour identifies.

Arbour trafficked drugs in Maine for a period of roughly eighteen months, supplying various individuals, including Dubreil, with cocaine and crack cocaine. In the course of this drug trafficking, Arbour unlawfully acquired at least six firearms. At sentencing, the government introduced evidence linking Arbour's unlawful acquisition of firearms with his drug trafficking. On at

least two occasions, Arbour, a convicted felon unable to obtain firearms legally, paid others -- in the form of drugs -- to acquire firearms for him. Jackson, who dealt drugs for Arbour on a fairly regular basis, acquired two firearms for Arbour in order to pay off a drug debt. In acquiring these firearms for Arbour, Jackson, who was too young to purchase the weapons himself, employed the services of Landry. In addition to Jackson, Arbour enlisted Giannelli to acquire firearms for him, paying Giannelli with cocaine for his service.

The government also introduced evidence that, after paying others drugs to acquire firearms for him, Arbour traded these firearms for drugs. First, Giannelli testified that after he turned a firearm over to Arbour, he witnessed a number of men arrive at Dubreil's home in cars with either Massachusetts or Connecticut plates. Giannelli observed the men enter a room with Arbour and Dubreil, and explained that it was his understanding that these individuals supplied Arbour with drugs and received "goods" in exchange. Subsequently, when Giannelli inquired into the status of the firearm he purchased for Arbour, Dubreil told him it was "already gone."

Second, during a raid of a home in Massachusetts, federal agents acquired, in addition to a significant amount of cocaine, a number of firearms. Two of these firearms were traced to Thompson, who had purchased them at Arbour's direction and expense. Finally,

during the district court proceedings, Arbour's counsel conceded that Arbour traded guns for cocaine on at least one occasion.

In light of the significant evidence of cross-pollination between Arbour's drug and firearms dealings, both in the form of overlapping goods and criminal participants, we cannot conclude that the district court clearly erred in rejecting Arbour's attempt to compartmentalize his criminal activity into separate, unrelated clusters.

## B.  Status determination

That the record supports the district court's finding that Arbour was involved in an extensive criminal activity, however, does not end the matter. United States v. Thiongo, 344 F.3d 55, 63 (1st Cir. 2003) ("[T]he mere fact that the defendant was involved in an extensive criminal activity does not support a finding the defendant was an organizer or leader under § 3B.1.") (citation omitted).  To qualify for an enhancement under § 3B1.1(a), a defendant must have either organized or led the criminal activity.  Accordingly, we address § 3B1.1(a)'s status component.

Arbour's challenge to the district court's status finding has two parts.  First, he contends that he did not lead or organize anyone, but merely interacted with various people during the commission of crimes.  Second, Arbour argues implicitly throughout his brief that, even if he led or organized some people, he did not

-11-

lead or organize the number of people required by § 3B1.1(a). The magic number, in Arbour's view, is five or more individuals.

Arbour's first argument is easily dismissed -- the record evidence amply supports the district court's finding that Arbour led or organized criminal participants including Jackson and Giannelli.[4] Both the guideline commentary and case-law provide direction for considering whether a defendant qualifies as a "leader or organizer." The guideline commentary provides a non-exhaustive list of factors that include: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. § 3B1.1(a), cmt. n.4. "There need not be proof of each and every factor before a defendant can be termed an organizer or leader." Tejada-Beltran, 50 F.3d at 111.

The case law has further defined the terms leader and organizer. "[T]he term leader implies the exercise of some degree of dominance or power in a hierarchy, and also implies the authority to ensure that other persons will heed commands." Id.

_____

[4] The district court did not label Arbour a "leader" as opposed to an "organizer" or vice-versa, appearing to conclude that Arbour could be characterized as both.

And "[o]ne may be classified as an organizer, though perhaps not as a leader, if he coordinates others so as to facilitate the commission of criminal activity." Id.

With respect to leading, Arbour, who was at the top of the relevant drug dealing operation in Maine, exercised decision-making authority over Giannelli, personally choosing which firearm he wanted Giannelli to purchase. See § 3B1.1(a), cmt. n.4 ("exercise of decision-making authority"). But the record even more clearly supports a characterization of Arbour as an organizer. There was evidence that Arbour hatched the plan to acquire firearms illegally and that he sought out three others, Jackson, Giannelli, and Thompson, to procure the weapons in his stead. See id. ("degree of participation in planning or organizing the offense"; "nature of participation in the commission of the offense"; "recruitment of accomplices"). Arbour's puppetry enabled him to later use these firearms as currency in his drug trade. See Tejada-Beltran, 50 F.3d at 112 ("coordinat[ing] others so as to facilitate the commission of criminal activity").

We turn finally to the second part of Arbour's challenge, which focuses on what he perceives to be § 3B1.1(a)'s requirement that he lead or organize at least five individuals. Arbour contends that, because he did not lead or organize five others, he does not qualify for an enhancement. This contention lacks merit.

On at least one occasion, we have acknowledged the possibility that the number of individuals a defendant must lead or organize to qualify under § 3B1.1(a) may depend in part on the district court's scope finding. Specifically, the question may hinge on whether the court finds the criminal activity to involve five or more participants or whether it finds the activity to be "otherwise extensive." See Rostoff, 53 F.3d at 414. In Rostoff, we established that where the defendant is involved in a criminal activity that is "otherwise extensive," there is no requirement that the defendant "lead or organize" at least four other participants. Id. ("Unlike numerosity, extensiveness does not depend upon a finding that a criminal activity embraced no fewer than five criminally responsible participants, much less a finding that the activity included four or more persons under the defendant's direct control.").

But we also noted in Rostoff that "some courts have held that, when the applicability of § 3B1.1(a) depends upon numerosity rather than extensiveness, the defendant must be shown personally to have [led or organized] no fewer than four other participants." 53 F.3d at 413 n.15 (citations omitted).[5] In so noting, we cited decisions from the Seventh and Tenth circuits. Id. (citing United

_____

[5] As these cases indicate, "[t]he operative number of other persons is four rather than five, since the defendant himself must be counted as a participant and the defendant presumably is under his own control." Rostoff, 53 F.3d at 413 (citations omitted).

-14-

States v. Carson, 9 F.3d 576, 584 (7th Cir. 1993) and United States v. Reid, 911 F.2d 1456, 1465 n.8 (10th Cir. 1990)).

Regardless of whether the criminal activity involved five or more participants or was otherwise extensive, the guideline commentary makes plain that a defendant needs only to have led or organized one criminal participant, besides himself of course, to qualify as a leader or organizer under § 3B1.1(a). § 3B1.1(a), cmt. n.2 ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants.") (emphasis added). Nearly every circuit court has reached this same conclusion. See, e.g., United States v. Gaskin, 364 F.3d 438, 466-67 (2d Cir. 2004) ("Defendant need have been an organizer or leader only with respect to any one of these [criminal participants] for the § 3B1.1(a) enhancement to apply."); United States v. Harvey, 532 F.3d 326, 338 (4th Cir. 2008) (same); United States v. Eis, 322 F.3d 1023 (8th Cir. 2003) (same); United States v. Owusu, 199 F.3d 329, 347 (6th Cir. 2000) (same); United States v. Kamoga, 177 F.3d 617, 621-22 (7th Cir. 1999) (same); United States v. Camacho, 137 F.3d 1220, 1224 n.3 (10th Cir. 1998) (same); United States v. Okoli, 20 F.3d 615, 616 (5th Cir. 1994) (same); United States v. Barnes, 993 F.2d 680, 684-86 (9th Cir. 1993) (same). In fact, the circuits we cited in Rostoff, the Seventh and Tenth, have since abandoned any requirement that the defendant lead or organize at least four

-15-

others in order to qualify for an enhancement under § 3B1.1(a). See Camacho, 137 F.3d at 1224 n.3; Kamoga, 177 F.3d at 621-22 (noting that § 3B1.1 "is designed precisely to prevent masterminds of criminal schemes from escaping responsibility for their role simply by delegating some authority to only one or two deputies").

Accordingly, both because the district court supportably concluded that Arbour's criminal activity was extensive, see Rostoff, 53 F.3d at 413, and because Arbour led or organized one or more of the five or more individuals involved in his criminal activity, he qualifies as a leader or organizer under § 3B1.1. Arbour's numerosity argument as to status must therefore also fail.

## III. Conclusion

For the reasons provided above, the sentence is affirmed.

**AFFIRMED.**