# United States Court of Appeals
## For the First Circuit

Nos. 05-2650
     05-2651
     05-2652
     05-2839

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ RIVERA CALDERÓN,
JESÚS POMALES-PIZARRO,
LEONARDO RIVERA TORRES,
LUIS ROSARIO-RIVAS,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Lipez and Howard, Circuit Judges,
and DiClerico,[*] District Judge.

Laura Maldonado Rodríguez for appellant Leonardo Rivera Torres.
Saul Roman Santiago for appellant José A. Rivera Calderón.
Rafael Anglada-López for appellant Jesús Pomales-Pizarro.
Judith H. Mizner, Assistant Federal Public Defender, Federal Defender Office, District of Massachusetts, for appellant Luis Daniel Rosario-Rivas.
German A. Rieckehoff, Assistant United States Attorney, with whom Nelson Pèrez-Sosa, Assistant United States Attorney, Chief, Appellant Division and Rosa Emilia Rodriguez Velez, United States Attorney, were on brief, for appellee.

August 26, 2009

_____

[*]Of the District of New Hampshire, sitting by designation.

**HOWARD**, **Circuit Judge**.  After a thirty-four day trial, a jury convicted the appellants, Jesús Pomales-Pizarro ("Pomales"), Luis Daniel Rosario-Rivas ("Rosario"), José A. Rivera Calderón ("Calderón"), and Leonardo Rivera Torres ("Torres"), of conspiring to possess with the intent to distribute cocaine, cocaine base, heroin, and marijuana.  See 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846.  They were later sentenced to lengthy prison terms.

The appellants challenge both their convictions and sentences.  They advance a spate of claims in the process, the most prominent one being a challenge to the sufficiency of the evidence underlying their convictions.  We are not persuaded that any of the claims justify the granting of relief.

## I.  Facts

We provide many of the salient facts here, adding more or elaborating further when discussing particular issues.  "Because the facts stated here are relevant to the appellants' sufficiency claims, we present them in the light most favorable to the jury's verdict."  United States v. Cruz-Rodríguez, 541 F.3d 19, 25 (1st Cir. 2008) (citation omitted).

The charged crimes arose from the operation of drug distribution points in Guaynabo, Puerto Rico.  The points were in operation from 1995 to 2003 in a public housing project.  The eight drug points, which were open twenty-four hours a day, were all located in La Placida, a square at the center of the project.  Collectively, they offered a buffet of contraband that included

marijuana, cocaine, crack cocaine, and heroin. The drug points were controlled by various "point owners," who periodically met with each other to discuss matters pertaining to the drug trafficking operation. These discussions addressed a variety of issues including ownership of points, drug pricing, security, rules and internal discipline.

Conspiracy members, including some of the point owners, performed various tasks that facilitated the functioning of the overall operation. Cookers processed drugs for the point owners. Runners transferred drugs from the points to the ground-level sellers who, in turn, sold the drugs to the ground-level customers. Runners would also relay a portion of the profits from the sales to the drug point owners. Finally, enforcers protected the network from various threats and maintained discipline within the network. To help them perform their roles, enforcers acquired, hid and used firearms.

After an investigation, which included warrant-based searches that resulted in the seizure of drugs from the apartments of appellants Pomales and Calderón, the government obtained a grand jury indictment. The indictment charged ten individuals, including the appellants, with conspiring to distribute drugs. The appellants elected to go to trial and were tried together.

At trial, the government relied predominantly on the testimony of two cooperating witnesses, Luis Rodriguez Gonzalez ("Rodriguez") and Jesus Rafael Rivera-Santiago ("Santiago"). Both acknowledged that they were members of the alleged conspiracy. In

addition to outlining the general structure of the operation, sketched above, the cooperating witnesses implicated all four appellants as members of the network.

Both witnesses identified appellant Pomales as the owner of a crack point. Rodriguez testified that Pomales employed four people, including Rodriguez himself and appellant Torres, who cooked cocaine into crack for Pomales.

The cooperating witnesses identified Rosario as performing, at various times, at least two roles within the network -- point owner and enforcer. Rodriguez testified that Rosario was the owner of a cocaine and crack point. Santiago corroborated this testimony and added that Rosario employed three others, including Torres, who cooked cocaine into crack for Rosario. With respect to Rosario's role as an enforcer, Rodriguez testified that Rosario enforced for himself and for other point owners. In Rosario's capacity as an enforcer, Santiago testified that Rosario bought and stored weapons, and indeed killed two people.

Santiago identified Calderón as a point owner, specializing in marijuana. According to Santiago, Calderón employed three people as sellers.

Finally, the cooperating witnesses portrayed Torres as a jack of all trades. Collectively, they testified that Torres cooked cocaine for Pomales, Rosario and Rodriguez; was a runner for Pomales and others; was a seller for Santiago; was an enforcer for Pomales and for others, along with Santiago and Rosario; and

eventually became a marijuana point owner, employing two people to sell for him.

The jury found all of the appellants guilty of conspiring to distribute controlled substances.  Challenging the sufficiency of the evidence, the appellants all filed unsuccessful motions for judgment of acquittal.  See Fed. R. Crim. P. 29(c).

## II.  Discussion

### A.  Trial

All four appellants present sufficiency claims.  Three of them also challenge the admission of certain evidence.  Although we might ordinarily consider the admissibility claims up front, for ease of exposition we first will take up the sufficiency arguments common to all of the appellants and then address the discrete admissibility claims.  Appellant Pomales also argues that he should have been tried separately from the other defendants.  We address that claim last.

### 1.  **Sufficiency of the Evidence**

As each defendant moved for a judgment of acquittal, we review the sufficiency claims de novo.  See United States v. Jiménez-Torres, 435 F.3d 3, 8 (1st Cir. 2006).  We view the evidence, both direct and circumstantial -- and including all plausible inferences drawn therefrom -- in the light most favorable to the verdict.  United States v. Fenton, 367 F.3d 14, 18 (1st Cir. 2004).  Additionally, we bear in mind that "[c]redibility issues must be resolved in favor of the verdict."  United States v. Pérez-Ruiz, 353 F.3d 1, 7 (1st Cir. 2003).

The appellants were charged with conspiracy to distribute drugs. To establish that a conspiracy existed, the government had to prove beyond a reasonable doubt that each defendant knowingly and voluntarily agreed with others to commit a particular crime. See Cruz-Rodríquez, 541 F.3d at 26. Such an agreement may be express or tacit, that is, represented by words or actions, and may be proved by direct or circumstantial evidence. See United States v. David, 940 F.2d 722, 733-34 (1st Cir. 1991); see also United States v. Barnes, 244 F.3d 172, 175 (1st Cir. 2001).

Where, as here, the government has charged multiple defendants with participation in a single conspiracy, an issue often arises over whether the evidence established that the defendants were participants in the single conspiracy charged or instead established that the defendants were involved in a conspiracy or conspiracies other than the one charged. See United States v. Soto-Beníquez, 356 F.3d 1, 18 (1st Cir. 2003). In the event of a variance in proof, a conviction will be reversed if there has been "prejudice to the defendant's substantial rights -- that is, when lack of notice regarding the charges deprives the defendant of his ability to prepare an effective defense and to avoid surprise at trial." Id. at 27.

Although all of the appellants argue that the evidence was insufficient to establish their involvement in the single charged conspiracy, at least two present arguments sounding in variance, suggesting that the evidence, at best, supports the existence of multiple, independent drug trafficking conspiracies

different from the one charged. When such arguments are advanced, the inquiry ordinarily is, again, one of evidentiary sufficiency. Pérez-Ruiz, 353 F.3d at 7; United States v. Portela, 167 F.3d 687, 696 (1st Cir. 1999) ("[W]hether a given body of evidence is indicative of a single conspiracy, multiple conspiracies, or no conspiracy at all is ordinarily a matter of fact; a jury's determination in that regard is subject to review only for evidentiary sufficiency.") (internal quotation marks and citation omitted). Accordingly, we must ask whether "a rational jury could have found beyond a reasonable doubt that each defendant joined a single conspiracy." Portela, 167 F.3d at 696 (emphasis added).

### a. Common purpose, interdependence and overlap

In determining whether the proof suffices to establish the single conspiracy charged, "we ultimately look at the totality of the evidence." United States v. Mangual-Santiago, 562 F.3d 411, 421 (1st Cir. 2009) (citation omitted). Factors to be considered in assessing the totality of the evidence include: (1) the existence of a common purpose, e.g., the distribution of drugs; (2) interdependence of various elements in the overall plan; and (3) overlap among the participants. United States v. Escobar-Figueroa, 454 F.3d 40, 48 (1st Cir. 2006).

After reviewing the evidence, we conclude that a reasonable jury could have convicted each of the appellants of the single conspiracy charged.

The government introduced evidence, predominately testimonial, that each of the appellants was a member of a large

-7-

drug distribution network that had the common purpose of selling drugs for profit. The government's two cooperating witnesses, Rodriguez and Santiago, identified Pomales, Rosario, Calderón and Torres as members of the conspiracy. These witnesses testified that all of the appellants were point owners and that two of them, Rosario and Torres, performed other roles in the conspiracy as well.

There was also substantial evidence of the distribution scheme's interdependence. Interdependence exists where "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." Mangual-Santiago, 562 F.3d at 422 (citations omitted). Here, there was evidence that the successful operation of the network depended in part on agreements reached, and concerted actions taken by, the drug point owners and their employees. For example, there was evidence that point owners worked together to maximize profits. One way they accomplished this goal, both cooperating witnesses testified, was by setting prices at meetings. Point owners also maximized profits in another manner -- by influencing competition within the project. Rodriguez testified that the point owners had power over point owner membership, observing that before a person could operate a drug point within the housing project, the prospective owner had to obtain authorization from the existing point owners. Corroborating Rodriguez's testimony with an example, Santiago testified that Rosario acquired a cocaine and crack point after receiving permission from the other point owners. Operating

a drug point without clearance, Santiago also testified, could "cost [a person] his life." This system influenced how much competition each point owner faced for his particular brand of drug and thereby allowed participants of the conspiracy oligarchical freedom from competition.

There was also evidence that the participants acted interdependently with respect to security at the drug points. In addition to holding meetings to discuss, inter alia, the protection of the drug points from "hold-ups," there was testimony that the point owners actively worked with each other to protect the drug points from threats. For example, Santiago testified that after one Wilfredo Sierra-Rosa ("Sierra") threatened to take over Santiago's, Torres' and Rosario's drug points, Santiago and Rosario confronted Sierra, and Rosario killed him. See Pérez-Ruiz, 353 F.3d at 7 (concluding that there was no cognizable variance where evidence showed that the appellant accompanied a self-confessed member of the conspiracy during a murder committed to further the interests of the conspiracy).

Also with respect to security, there was testimony that point owners and their enforcers stored weapons together inside the project. Santiago testified that Torres, in his role as an enforcer, stored weapons for Pomales in various places, including in automobiles which Pomales and Torres had purchased together. Similarly, Santiago testified that he and Rosario purchased rifles together to use for security purposes. Santiago further testified that he and Rosario stored guns and drugs in a Ford Windstar that

Santiago and Torres had purchased and had customized for the purpose of secreting weapons and drugs.

Interdependency was also demonstrated by the various rules established by the participants in the conspiracy. Santiago testified that, to avoid attracting police attention, the point owners agreed to prohibit people from stealing drugs within the project and from bringing stolen cars into the housing project. Point owners agreed on rules about what types of packaging could be used for the drugs. Those who failed to follow these rules could be disciplined. Rodriguez testified that point owners agreed to discipline out-of-line participants by beating them with a wooden board or rod. And Santiago testified that if a person was not "in agreement" with the other participants in the network and did "something that was incorrect," he "could get shot or his head bashed in." Both Rodriguez and Santiago testified that a point owner named Armando Valdes Medina ("Valdes") was told at a meeting not to sell drugs in a particular type of packaging because that type of packaging was used by another point owner. After Valdes failed to follow this directive, Rosario and others murdered Valdes.

Finally, as to overlap among the participants of the conspiracy, Santiago testified that Torres cooked crack for Pomales, Rosario and Rodriguez. Santiago further testified that Torres stored weapons for Pomales, and also stored weapons with Rosario and Santiago himself.

## b.  Sufficiency challenges

Each appellant argues that the evidence was insufficient to establish his involvement in the single charged conspiracy. In addition to a common assertion that the drug points were operated independently, three of the appellants also attack specific purported weaknesses in the proof. Rosario presses the argument that there was insufficient evidence of interdependency. He emphasizes that the government failed to show that the participants explicitly set prices; shared a source of supply and proceeds; extended credit to each other; or set or controlled working hours. Torres, Rosario and Calderón argue that the government failed to produce sufficient evidence of overlap: Torres says that the government failed to tie him to all of the drug points; Rosario claims that there was no evidence of a connection between him and Pomales or between him and Calderón; and Calderón asserts that the government failed to tie him to any of the other appellants. None of these arguments is compelling enough to upset the jury's finding of a single conspiracy.

With respect to Rosario's interdependency challenge, the government may establish interdependency without proving that the point owners reached a consensus on all facets of their drug distribution network or that they organized their network for maximum operating efficiency. As described above, there was enough evidence of interdependency to allow a rational jury to conclude

that a single conspiracy was operating out of the housing project.[1]

With respect to the ties between the appellants, as we have said in the past, "each coconspirator need not know of or have contact with all other members [of the conspiracy], nor must they know all of the details of the conspiracy or participate in every act in furtherance of it." United States v. Martínez-Medina, 279 F.3d 105, 113 (1st Cir. 2002). This rule dispatches both Torres' and Rosario's claims, which amount to requests that the evidence must establish a direct connection between them and all of the other participants.

As for Calderón's claim that there was insufficient proof of a tie between him and any of the other conspirators, there was evidence of connections to at least three other participants. First, Calderón and Rosario employed a common seller, an individual named "Cheo." Second, the government introduced a videotape of Calderón, Torres and Santiago together at a drug point, where Calderón and Santiago were counting money. Additionally, the jury reasonably could have relied on other evidence to link Calderón to the other appellants and to the conspiracy. Santiago testified that no one could operate a point within the housing project without first obtaining the blessing of the other point owners, and that those who tried to operate a drug point without this approval

---

[1] If more were needed, and we doubt that it is, we also note that Rosario's suggestion that the government failed to produce evidence that the point owners set prices for drugs is belied by the record. When asked on direct examination who "determined the price" of drugs, Rodriguez testified that it was "the owners." And when later asked what "type of business" was taken care of at the meetings of the point owners, Rodriguez mentioned "the prices."

could be killed. Consistent with this tight control, Santiago stated that Sierra was murdered when he attempted to gain control of drug points without approval. Moreover, point owners were subject to certain rules. Santiago testified that if a point owner or other participant was not "in agreement" with the others, or violated certain rules, he could suffer fatal consequences; as Santiago and Rodriguez both testified, Valdes met that end. Based on this testimony, a jury could have reasonably inferred that Calderón, who successfully operated a busy marijuana point within the project for at least three years, was part of the single conspiracy charged.

Rosario, Torres, and, to an extent, Calderon, appear to argue that rather than establishing interdependency and participant overlap, the evidence established merely that each of them was the master of his own domain, that each was involved in a separate, uncharged conspiracy -- with his own runners, sellers, and enforcers -- to sell a particular brand of drug. In support of this argument, Rosario in particular notes that Santiago testified that the points "were always in competition." It is argued that this testimony suggests that the drug enterprises operating within the housing project were at odds with each other rather than unified.

Certainly, the proof would have failed had the evidence established only that each defendant presided over a cloistered drug distribution unit that intersected only casually with other similarly-cloistered units. But, as described above, the

-13-

government presented evidence implicating each of the appellants in a drug distribution network that was greater than the sum of its parts. Witnesses testified that a drug point could be operated within the housing project only with the approval of the other point owners and that people operating a point without approval could be and were in fact killed; point owners and their underlings had to follow certain rules, and a failure to abide by these rules could and did in fact result in corporal punishment or death; and participants pooled their efforts with respect to drug pricing, security and discipline. Because the government introduced evidence that each of the appellants successfully operated a point within the housing project, a reasonable jury could have concluded that they were guilty of the single conspiracy charged. See Pérez-Ruiz, 353 F.3d at 7 (holding that no variance occurred because there was sufficient evidence that "appellant's drug point was part and parcel of the master conspiracy"). As for Santiago's remark about competition, even if there was some competition between the points for individual customers, that alone does not detract from the various ways the appellants conspired together.[2] See United States v. Patrick, 248 F.3d 11, 16, 19-20 (1st Cir. 2001) (finding the evidence sufficient to convict the defendant for his involvement in a conspiracy even though the defendant competed with fellow conspirators for individual customers).

---

[2] We note that there is no other record evidence suggesting that the point owners were engaged in serious competition (e.g., that they took any steps to undercut each others' sales in any way).

In sum, a rational jury could have found beyond a reasonable doubt that the appellants were guilty of participating in the charged conspiracy.

## 2.  **Evidentiary Rulings**

Three of the appellants take issue with certain of the district court's evidentiary rulings.  We examine each of their arguments in turn.

### a.  **Admission of Santiago's testimony (Torres)**

Torres argues that the district court erred when it allowed Santiago, one of the government's two cooperating witnesses, to testify.  Torres contends that the court should have excluded Santiago's testimony, because the government committed a discovery violation when it belatedly disclosed materials to the defense that related to this testimony.[3]  Torres alleges that these delayed disclosures precluded his counsel from adequately representing him at trial.

We doubt that this delayed disclosure claim has been preserved, as Torres failed to request a continuance from the trial judge.  See United States v. Van Anh, 523 F.3d 43, 51 (1st Cir. 2008) ("Because the defendants failed to ask for a continuance, we seriously doubt they have preserved their delayed discovery claim."); United States v. Smith, 292 F.3d 90, 103-103 (1st Cir. 2002) ("[D]efense counsel must typically request a continuance to

---

[3]  Two items were belatedly disclosed:  (1) a letter summarizing Santiago's proposed testimony, disclosed to the defense four days prior to Santiago's testimony; and (2) Santiago's own notes of his interviews with federal prosecutors, disclosed to the defense during Santiago's testimony.

preserve a claim of prejudice by delayed disclosure of evidence."). In any event, the district court did not abuse its discretion in admitting Santiago's testimony.

Where the government is aware of evidence that is potentially useful to impeach a witness, it must provide that evidence to the defense in a timely fashion. Id. at 51 n.5 (citing Giglio v. United States, 405 U.S. 150, 153-54 (1972)). If disclosure of such evidence is delayed, the delay leads to reversal if "there is a reasonable probability that, had the evidence been disclosed to the defense in a timeous manner or had the trial court given the defense more time to digest it," the outcome of the trial would have been different. Pérez-Ruiz, 353 F.3d at 8-9 (citing United States v. Bagley, 473 U.S. 667, 678 (1985)).

Apart from the ultimate question of the probability that a timely disclosure would have changed the result of the proceeding, however, we ordinarily require the appellant to first show that "the delay prevented defense counsel from using the disclosed material effectively in preparing and presenting the defendant's case." Van Anh, 523 F.3d at 51; United States v. Lemmerer, 277 F.3d 579, 587 (1st Cir. 2002). "[T]he defendant must at a minimum make a prima facie showing of a plausible strategic option which the delay foreclosed." United States v. Misla-Aldarondo, 478 F.3d 52, 63 (1st Cir. 2007).

Torres has made no such showing here. Although he summarily claims that the late disclosure of the evidence prevented his lawyer from providing effective representation, he has failed

-16-

to identify <u>how</u> it did so.  This failure is fatal to his claim. <u>See</u> <u>United States</u> v. <u>Young</u>, 45 F.3d 1405, 1409 (10th Cir. 1995) ("[A]ppellant's vague assertion that the late disclosure affected preparation of the defense is not sufficient.").  Moreover, we note that we have held that similar delays did not preclude defense counsel from using the late-arriving materials effectively.  <u>See</u> <u>Van Anh</u>, 523 at 52 ("It is not surprising that defense counsel effectively used this evidence [during cross-examination], having had three days to determine how to best put it to use."); <u>United States</u> v. <u>Sepulveda</u>, 15 F.3d 1161, 1179 (1st Cir. 1993) (observing that delayed disclosure did not prevent defense counsel from effectively preparing and presenting case where counsel received evidence while the witness was testifying and effectively incorporated its contents into the cross-examination).

### b. **Admission of the firearm (Calderón)**

At trial, a Puerto Rico police officer testified that he seized a gun from Calderón.  The seizure took place outside of the housing project.  When asked to identify Calderón in court, the officer identified Pomales instead.  The gun was admitted into evidence over defense objections.

Calderón argues that the court should have excluded the gun under Rule 403 of the Federal Rules of Evidence because the firearm's probative value was substantially outweighed by its unfairly prejudicial impact.[4]  Fed. R. Evid. 403; <u>United States</u> v.

---

[4] Although appellant Pomales also purports to challenge the admission of the gun under Rule 403, he fails to develop his argument in any respect.  <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1,

-17-

Griffin, 524 F.3d 71, 81 (1st Cir. 2008). Calderón minimizes the relevance of the gun, noting that the government failed to connect the weapon to the housing project where the alleged conspiracy operated. He also claims that the court should have considered the officer's in-court identification of Pomales as the person from whom the gun was seized as an aggravating factor when conducting Rule 403's required balancing.

The trial court's decision to admit the weapon is reviewed for abuse of discretion. United States v. Upton, 559 F.3d 3, 15 (1st Cir. 2009). "[O]nly rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." United States v. Dunbar, 553 F.3d 48, 58 (1st Cir. 2009) (internal quotation marks and citation omitted).

The gun clearly was relevant evidence.[5] "[I]n drug trafficking firearms have become 'tools of the trade' and thus are probative of the existence of a drug conspiracy." United States v. McGuire, 389 F.3d 225, 230 (1st Cir. 2004) (citations omitted). Here, the government introduced evidence that the drug distribution network active at La Placida used guns to further its operation.

17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

[5] "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

Accordingly, that an officer retrieved a gun from a man named José Rivera Calderón, who was carrying the gun during the life of the conspiracy and in the vicinity of the housing project, made it "more probable" that Calderón was a member of this particular conspiracy.  And it was similarly probative of Pomales' connection to the conspiracy, as the officer identified him in open court as the person who possessed the gun.

But if the gun was most likely seized from Pomales, as the officer's in-court identification indicated, then one might argue that Calderón was unfairly prejudiced by the court's decision to admit the gun into evidence with his name effectively still attached to it.  Doing so, the argument runs, created a risk that the jury would convict him of the conspiracy charge based on an improper basis -- the possession of a deadly weapon.  Fed. R. Evid. 403 advisory committee's note ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis.").

But this risk was so small that we cannot say that the Rule 403 balance weighed in favor of exclusion.  The gun was most clearly associated with Pomales, not Calderón.  Given two opportunities to identify the person who possessed the gun, the officer identified Pomales both times.  Calderón's counsel made a point to underscore the officer's failure to associate the gun with his client, noting before the jury that "[the officer] has not been able to identify [Calderón]."  Even the government itself acknowledged before the jury that the officer had failed to

-19-

identify Calderón as the person from whom the gun was seized.  In fact, the identification problem arguably inured to Calderón's benefit, as it suggested a weakness in the government's proof against him.

In any event, any error would be harmless. Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").  As our sufficiency analysis above indicates, the government introduced ample evidence of Calderón's involvement in the charged conspiracy. See United States v. Adams, 375 F.3d 108, 113 (1st Cir. 2004) ("Even if we found a violation of Rule 403, we would regard any error as harmless because this evidentiary ruling could not have affected the outcome.") (citation omitted).

### c. Admission of murder evidence (Rosario)

The superseding indictment included the murders of Valdes and Sierra as overt acts undertaken in furtherance of the drug conspiracy.  At trial, the government's cooperating witnesses, Rodriguez and Santiago, described the murders, implicating Rosario and others in both of them.  In connection with this testimony, the government introduced photographs of the bodies of the victims, identification testimony from family members of the victims, testimony from officers who responded to the scenes of the shootings, and testimony from pathologists. Prior to this evidence being admitted, Rosario filed a motion in limine, which the court denied after a hearing.

Rosario argues that the district court erred when it admitted testimony from Rodriguez and Santiago describing the murders along with other testimony concerning the murders. His argument has two parts. First, he contends that the murder testimony was irrelevant under Rules 401 and 402 of the Federal Rules of Evidence. In his view, the government failed to establish that the murders were related to or in furtherance of the charged conspiracy. Second, and alternatively, he argues that even if the murder testimony was relevant, the court should have excluded it because it was unfairly prejudicial under Rule 403. See Fed. R. Evid. 403. In particular, he argues that the testimony from the cooperating witnesses, pathologists, firearms examiners and family members of the victims placed an undue emphasis on the murders.

**(1) Relevance**

We review the court's relevancy determination, objected to by Rosario below, for abuse of discretion. United States v. Wallace, 461 F.3d 15, 28 (1st Cir. 2006). Rosario's Rule 403 claim, however, makes its debut on appeal and we therefore review it for plain error only.[6] Id.

The court did not abuse its discretion in ruling that the murder evidence was relevant. Each murder was relevant in at least two respects: (1) to help prove the existence of a single,

---

[6] To satisfy the plain error standard, Rosario "must show an error that was plain (i.e., obvious and clear under current law), prejudicial (i.e., affected the outcome of the district court proceedings), and that seriously impaired the fairness, integrity, or public reputation of the judicial proceedings." Griffin, 524 F.3d at 76.

-21-

overarching drug conspiracy; and (2) to help prove Rosario's involvement in that conspiracy.

With respect to the murder of Valdes, Rodriguez testified that Rosario killed Valdes, who allegedly was a point owner in the conspiracy, shortly after Valdes refused to adhere to rules about packaging set by the other point owners. This testimony tended to show that the point owners made rules that were subsequently enforced, and therefore helped to establish that a single, cohesive conspiracy was at work within the housing project. See United States v. DeCologero, 530 F.3d 36, 54 (1st Cir. 2008) (noting that a murder was relevant to the RICO conspiracy counts "as it tended to prove the existence and nature of the RICO enterprise and conspiracy" (citation omitted)); Soto-Beníquez, 356 F.3d at 32 ("The murder furthered the conspiracy by sending the message that those suspected of stealing from the conspiracy would be treated harshly.") (citation omitted).

This evidence also helped link Rosario to the conspiracy, as the jury could infer from the murder that he was enforcing the conspiracy's directives. See Pérez Ruiz, 353 F.3d at 6-7 (evidence that the appellant accompanied a conspiracy member during the assassination of an "apostate drug dealer who had broken [with the conspiracy]" helped support appellant's conspiracy conviction); United States v. Rodriguez, 162 F.3d 135, 143 (1st Cir. 1998) ("[Appellant's] violence against a suspected informant is relevant to prove his membership in the conspiracy and his acceptance of its objectives.").

As for Sierra's murder, Santiago testified that Rosario shot and killed Sierra because Sierra had threatened to take over Santiago's, Torres', and Rosario's drug points. The evidence of this murder helped to establish the existence of a conspiracy in two ways. First, it showed joint efforts undertaken by co-conspirators to protect drug territory. See Soto-Beníquez, 356 F.3d at 32 (evidence that a victim was "murdered to protect the drug territory" was admissible to demonstrate the existence of a conspiracy). Second, the evidence corroborated the testimony about concerted discipline: those who attempted to sell drugs without the approval of the point owners could be killed. Additionally, similar to the Valdes killing, the murder of Sierra was also relevant in that it helped establish Rosario's involvement in the conspiracy, by linking him with fellow accused co-conspirator Torres and with Santiago, an admitted co-conspirator and cooperating witness.

Rosario's contention that neither murder was relevant is unavailing. He begins by broadly challenging the relevance of both murders, noting that "participation in a drug related murder with members of a drug conspiracy does not, standing alone, establish membership in that drug conspiracy." United States v. Garcia-Torres, 280 F.3d 1 (1st Cir. 2002). We agree. But the government did not rely on this murder evidence alone to establish Rosario's membership in the conspiracy. Both Rodriguez and Santiago testified to Rosario's other conspiratorial activities within the housing project, including his drug dealing and his efforts to hide

-23-

weapons for security purposes.  See Rodriguez, 162 F.3d at 143 ("Contrary to [the appellant's] claim, the evidence of the beating does not stand alone as proof of his membership in the conspiracy . . . four witnesses testified that they either saw [him] selling drugs and/or purchased drugs directly from him."). A witness also placed Rosario at one of the point owner meetings, further establishing his connection to the conspiracy.

Rosario also attacks the relevance of each murder independently.  He challenges the relevance of the Valdes murder in two ways.  First, he argues that there was no evidence that he was at the meeting where the point owners told Valdes to stop using a particular type of packaging.  Accordingly, he appears to suggest that even if he did murder Valdes, that murder cannot be tied to Valdes' refusal to abide by conspiracy directives.

But a piece of evidence need not conclusively establish the existence of a fact to be considered relevant.  Rather, it need only have the "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Here, the point owners ordered Valdes to stop using a particular type of drug packaging.  The government introduced evidence that, shortly after Valdes' refusal to do so, Rosario killed him.  This evidence made it "more probable" that Rosario was a member of the conspiracy, as a jury could reasonably infer from this and other record evidence that Rosario was carrying out the conspiracy's wishes.

-24-

Next, Rosario argues that evidence of Valdes' murder was irrelevant because "absent evidence that the elimination of one conspirator would increase drug sales or profits, evidence not present here, no furtherance of the group objective was shown." The murder of Valdes, however, sent a message that rules set by the conspiracy would be enforced. Sending such a message would have been in the conspiracy's economic interests given that some of its rules, e.g., those dealing with pricing and brand protection, directly influenced profits.

Rosario's challenge to the relevance of the Sierra murder is even less substantial. First, he suggests that Sierra's murder might be irrelevant because during voir dire Santiago testified that Rosario may have had another reason for wanting to kill Sierra, that Sierra's brother had been disrespectful to Rosario's wife. But Santiago identified that motive as an <u>additional</u> reason that Rosario wanted Sierra dead (in addition to the threat Sierra posed to Rosario's, Santiago's and Torres' drug points). That Rosario may have had another reason for killing Sierra that was unrelated to the furtherance of the conspiracy's objectives went to the weight rather than to the relevance of the evidence. <u>See</u> <u>United States</u> v. <u>Rose</u>, 104 F.3d 1408, 1413 (1st Cir. 1997). Next, Rosario argues that the murder of Sierra, an outsider who had threatened to take over the points of conspiracy members, could not have furthered the objectives of the conspiracy. This argument is a non-starter. As a potential competitor, Sierra posed an obvious threat to the conspiracy's economic interests.

## (2) Prejudice

Of course, under Rule 403 relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403.[7] Rosario makes an extended Rule 403 argument on appeal. He begins by minimizing the probative value of the murders, noting that the government did not charge him or any of the other appellants with murder. He then argues that the extensive testimony about the murders, elicited from a number of witnesses, placed an unnecessary and prejudicial focus on the murders.

Before considering Rosario's Rule 403 argument, we note what he does not argue. At trial, the court admitted murder scene photographs depicting the bodies of Valdes and Sierra. These photographs, especially two in particular, were graphic. When the photographs of the bodies were admitted, Rosario's counsel explicitly preserved a Rule 403 objection, which Rosario makes note of in the fact section of his opening brief.

On appeal, Rosario has waived any argument that the admission of the photographs caused him unfair prejudice. See Zannino, 895 F.2d at 17. In developing his Rule 403 argument, Rosario makes no mention of the photographs. Instead, he focuses on the testimony elicited from the cooperating witnesses and

_____

[7] The rule states in its entirety: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

-26-

others.[8]  Moreover, Rosario makes it clear that the Rule 403 argument he presents on appeal is governed by the plain error standard of review, further indicating that he has abandoned his preserved objection to the photographs which would have been reviewed for abuse of discretion.  Rosario's reply brief offers little more.  There, he states that he was unduly prejudiced by "the government's presentation of testimony from family members, pathologists and firearms examiners <u>as well as some of the photographs introduced</u>."  (emphasis added).  Even putting aside that an argument cannot make its first appearance in a reply brief, the argument is not sufficiently developed in any event.  The reply brief does not identify which pictures he is referencing and how they had the capacity to unfairly prejudice him.

What remains is Rosario's challenge to the testimony about the murders.  With respect to the testimony from the cooperating witnesses, there was no error, much less plain error.  Although none of the defendants was individually charged with the murders, the murders were relevant to the conspiracy charges brought against Rosario and the other appellants, and not marginally so, as Rosario would have us believe.  As previously noted, the murders were charged as overt acts in furtherance of the conspiracy and helped establish not only the existence of a

---

[8] Rosario's argument heading is illustrative:  "The Emphasis on the Shootings, Overt Acts Rather Than Elements of the Offense, <u>Through the Testimony</u> of Not Only Percipient Witnesses But Pathologists, Police and a Family Member, Was Unfairly Prejudicial; the Admission of the Unnecessary <u>Testimony</u> Was Plainly Erroneous." (emphasis added).

-27-

conspiracy but also Rosario's connection to it.  Moreover, the testimonial accounts of the murders do not appear to have been calculated to arouse the passions of the jury.  Both Rodriguez and Santiago described the murders matter-of-factly, stating that the men were shot but leaving out graphic details.  C.f. United States v. Portillo-Quezada, 469 F.3d 1345, 1354 (10th Cir. 2006) (holding that the court did not abuse its discretion in allowing partly "graphic" testimony about the conspiracy defendant's uncharged murder of a victim).  And although the discussion of murder at any level of detail was bound to leave an impression on the jury, "trials were never meant to be antiseptic affairs; it is only unfair prejudice, not prejudice per se, against which Rule 403 guards."  Veranda Beach Club Ltd. P'ship v. W. Sur. Co., 936 F.2d 1364, 1372 (1st Cir. 1991).

A somewhat closer question is presented by the court's admission of the other murder-related testimony including (1) testimony from Valdes' wife about her identification of Valdes' body;[9] (2) testimony from the pathologists who examined the bodies; (3) testimony from firearms examiners identifying the caliber of ammunition used in the murder; and (4) testimony from the police officers who gathered and processed the evidence of the murders.

On the one hand, admitting this evidence arguably carried the risk of turning a drug conspiracy case into a murder case.  On the other hand, this evidence was not completely gratuitous.  The

---

[9] Pursuant to a stipulation, the government agreed not to introduce identification testimony from Sierra's father.

government was relying on the testimony of two admitted drug dealers and co-conspirators to establish that the murders charged as overt acts done in furtherance of the conspiracy occurred, and this evidence corroborated their accounts of these murders.[10] Also, Rosario contested his involvement in the murders, and the evidence that was presented helped link him to the crimes. For example, there was testimony at trial that Rosario used a nine-millimeter gun when committing both murders, and the forensic examiner testified that nine-millimeter caliber bullets were recovered from both victims.

Given these tension points, and the great deal of deference we afford district court rulings of this sort, even were we to conclude that the court erred in admitting this evidence the error would not be "clear" or "obvious," as the applicable plain error standard of review demands. See Griffin, 524 F.3d at 76 (noting that a plain error is one that is "obvious and clear under current law").

### 3. Severance

Pomales alone argues that the district court should have sua sponte severed his trial from that of his co-defendants. He contends that the murder evidence described above caused him unfair

_____

[10] For example, the cooperating witnesses testified as to how the murders occurred. The testimony of the pathologist corroborated their version of events, as the pathologist, after examining the bodies, expressed her opinion with respect to the likely distance at which the victims were shot, and further testified as to how many times each victim was shot.

prejudice as, unlike Rosario, he was not directly implicated in either of the murders.

Pomales, however, failed to file a severance motion before trial. "A motion to sever charges or defendants must be made before trial," United States v. Rodríguez-Lozada, 558 F.3d 29, 45 (1st Cir. 2009) (citing Fed. R. Crim. P. 12(b)(3)(D)), and "[f]ailure to move for severance before the deadline for filing pretrial motions constitutes waiver, which may be excused only on a showing of good cause," id. (citing Fed. R. Crim. P. 12(e)). Here, Pomales has failed to identify any cause for his failure to file a severance motion, much less good cause.[11]

## B.  Sentencing

The appellants present a number of sentencing claims, some procedural and others substantive. Most of the alleged procedural errors concern the district court's calculation of guideline sentencing ranges. All of the claims of procedural error involve fact-bound determinations made by the district court. Review of those issues is thus for clear error. See United States v. Olivero, 552 F.3d 34, 38 (1st Cir. 2009); see also Cruz-Rodríguez, 541 F.3d at 31-32 (drug quantity finding reviewed for clear error). We will not find clear error unless "'on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed.'" United States v. Brown, 298 F.3d

_____

[11] Both Pomales and the government framed the issue as whether the district court committed plain error in refusing to sever Pomales' trial sua sponte. But, in this situation, the focus under Rule 12 is on whether his waiver may be excused.

120, 122 (1st Cir. 2002) (quoting Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1986)).

The jury found beyond a reasonable doubt that the conspiracy as a whole was responsible for one kilogram or more of heroin, five kilograms or more of cocaine, fifty grams or more of cocaine base/crack cocaine, and one hundred kilograms or more of marijuana. These amounts, pursuant to 21 U.S.C. § 841(b)(1)(A), trigger a statutory maximum extending to life imprisonment. See Pérez-Ruiz, 353 F.3d at 15; see also United States v. Sanchez-Badillo, 540 F.3d 24, 35 (1st Cir. 2008) ("The applicable statutory maximum sentence in a drug conspiracy case is determined from a 'conspiracy-wide perspective.'" (citation omitted)).

At sentencing, however, a court must take care not to "automatically shift the quantity attributable to the conspiracy as a whole to the defendant." Cruz-Rodríguez, 541 F.3d at 32 (citing United States v. Colón-Solís, 354 F.3d 101, 103 (1st Cir. 2004)). Rather, "[w]here a defendant has been convicted of participating in a drug-trafficking conspiracy, a sentencing court must determine the specific quantity of drugs for which the defendant is [personally] responsible." Cruz-Rodríguez, 541 F.3d at 32 (citing Colón-Solís, 354 F.3d at 103); see also United States v. Vargas, 560 F.3d 45, 49 (1st Cir. 2009) (recognizing that "a defendant's offense level is driven largely by the quantity of drugs attributed to him" (citation omitted)).

A defendant is responsible for "drugs he personally handled or anticipated handling, and, under the relevant conduct

-31-

rubric, for drugs involved in additional acts that were reasonably foreseeable by him and were committed in furtherance of the conspiracy." Sepulveda, 15 F.3d at 1197 (citing United States v. Garcia, 954 F.2d 12, 15 (1st Cir. 1992)). The quantity finding must be supported by a preponderance of the evidence, Rodriguez, 525 F.3d at 107; United States v. Rivera-Maldonado, 194 F.3d 224, 228-29 (1st Cir. 1999) (noting that a district court's quantity finding must have "demonstrable record support" and be based on reliable evidence), but "the sentencing court may rely on reasonable estimates and averages." Rivera-Maldonado, 194 F.3d at 228.

Before considering the individual challenges, we make two additional observations. First, in seeking to establish each of the appellants' drug quantity exposure, the government relied almost solely on testimony from its cooperating witnesses -- Rodriguez and Santiago. We note that such testimonial evidence alone may be sufficient to support a district court's quantity determination. United States v. Huddleston, 194 F.3d 214, 224 (1st Cir. 1999) ("The appropriateness of the court's reliance on Morel's testimony dooms the appellant's drug quantity challenge."); United States v. Webster, 54 F.3d 1, 5 (1st Cir. 1995). Second, although challenging the district court's drug quantity assignments in a number of respects, none of the appellants directly assails the credibility of these cooperating witnesses.

### 1. **Rosario**

The court found Rosario responsible for five kilograms of heroin, five kilograms of cocaine, fifty grams of crack cocaine, and one hundred kilograms of marijuana. Based on the drug equivalency tables (which assign non-marijuana drugs a marijuana-based value) the court found Rosario responsible for 6,305 kilograms of marijuana. U.S.S.G. § 2D1.1(c)(3). This amount of marijuana resulted in a base offense level ("BOL")of 34. Id. ("At least 3,000 KG but less than 10,000 KG of Marihuana . . . ."). Rosario's BOL was increased by two levels for his possession of firearms while part of the drug conspiracy, id. § 2D1.1(b)(1), and was adjusted upward another four levels for his being a leader or organizer of a criminal activity that had at least five participants or was otherwise extensive, id. § 3B1.1(a). The resulting total offense level of 40 combined with a criminal history category of IV to yield a sentencing range of 360 months to life. The court sentenced him to life imprisonment.

Rosario argues that the drug quantity finding is erroneous for two reasons. First, he contends that the court improperly saddled him with the drug amounts the jury attributed to the conspiracy as a whole. For example, he notes that the court observed, "It's going to have to be at least five [kilograms], because the jury already made that determination." The jury, of course, merely concluded that the conspiracy as a whole was responsible for at least five kilograms of cocaine. Rosario argues, alternatively, that the court's quantity finding was based

merely on speculative estimates in reliance on general testimony from the two cooperating witnesses, Rodriguez and Santiago.

Rosario appears correct that the jury concluded that the conspiracy as a whole was responsible for at least one kilogram of heroin, five kilograms of cocaine, fifty grams of cocaine base/crack cocaine, and one hundred kilograms of marijuana. Those were the conspiracy-wide floors set by the jury. The court's finding with respect to Rosario, however, indicates that the court believed that it was required, due to the jury's determination, to find him individually responsible for, at a minimum, those amounts. When making its final quantity determination with respect to Rosario, the court said:

> So using the drug equivalency table to convert cocaine, crack cocaine and heroin into marijuana, in this case I will use the lowest quantity of drugs of <u>5 kilograms of cocaine</u>, which converts to 205 kilograms of marijuana; I use only 5 grams of crack cocaine, that converts into a thousand kilograms of marijuana; five kilograms of heroin, which converts into 5,000 kilograms of marijuana, and in addition to a hundred kilograms of marijuana, that converts into 6,305 [kilograms of marijuana].

(emphasis added).[12]

---

[12] Although the district court said it was using "5 grams" of crack cocaine, it is clear that the court actually used the conspiracy-wide minimum of fifty grams. Under the 2005 guidelines applicable to this sentencing, fifty grams of crack cocaine would have been equivalent to 1,000 kilograms of marijuana. <u>Id.</u> § 2D1.1 ("1 gm of Cocaine Base = 20 kg of marijuana").

The error in the powder cocaine quantity calculation, however, was harmless.[13]  This is because, contrary to Rosario's assertion that the court's quantity findings were based on speculation, there was credible evidence that Rosario was personally responsible for those quantities at the very least.  The information with respect to drug quantity came from the two cooperating witnesses.  Both witnesses were drug point owners who sold drugs contemporaneously with Rosario.  Rodriguez testified that in 1998 Rosario sold approximately a half a kilogram of cocaine per month, translating into roughly six kilograms of cocaine for that one year alone.

Rodriguez also testified that in 1998, Rosario sold approximately a half a kilogram of crack per month (again, translating into roughly six kilograms of crack per year).  Santiago  testified that in 1999, Rosario sold crack at a rate of about one kilogram per month (or, roughly, twelve kilograms per year).  During 2000 and 2001, Santiago testified, Rosario sold about one and a half kilograms of crack per month (for a total of approximately thirty-six kilograms over those two years).  All told, there was testimony that Rosario sold approximately fifty-four kilograms of crack during that span of time.  The district

_____

[13] "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."  Fed. R. Crim. P. 52(a); Rodriguez, 525 F.3d at 108-09 ("If a district court makes an erroneous factual finding under the sentencing guidelines, yet 'there is enough evidence to support the alternative explanation for the court's finding, the error would be harmless and there would be no reason to remand to the district court when the result will be the same.'" (quoting United States v. Pizzaro-Berríos, 448 F.3d 1, 8 (1st Cir. 2006)).

court attributed to Rosario only fifty grams, less than a tenth of a per cent of the amount testified to.

As for heroin, Santiago testified that in 1998 and 1999, Rosario sold a half a kilogram of heroin per month and, in 2000 and 2001, slightly more than a half a kilogram of heroin per month. This put Rosario's three year total, conservatively, at twenty-four kilograms of heroin. The court found him responsible for five kilograms.

Finally, although no one testified that Rosario sold marijuana himself, he was present at a point meeting in 1998 and discussed drug business with Rodriguez who was, at the time, a fellow point owner selling approximately eight pounds of marijuana per month (or roughly forty-four kilograms of marijuana for the year). In a drug conspiracy, a defendant is responsible for "all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." U.S.S.G. § 1B1.3, Application Note 2.[14]

Based on this testimony, the sentencing court's apparent misstatement about the conspiracy-wide minimum was harmless. The court was conservative in assigning a drug quantity to Rosario. His crack dealings alone could have placed him at a base offense level of 38, and the court recognized the abundance of available

_____

[14] Although this quantity fell short of the one hundred kilograms of marijuana the court assigned to Rosario (by fifty-five kilograms), that made no difference to the ultimate offense level assigned. The court found Rosario responsible for 6,305 kilograms of marijuana (once the other drugs were properly converted). This is well over the 3,000 kilogram amount required to trigger a Level 34 base offense level. Id. § 2D1.1(c)(3).

evidence.[15]  Moreover, the quantity determination did not take into account much of the additional drug activity of the conspiracy that would have been reasonably foreseeable to Rosario.  See Rodriguez, 525 F.3d at 109 ("These estimates are especially cautious because they account only for the cocaine that Appellant personally handled . . . and not for additional amounts handled by other[s] . . . whose drug activity was reasonably foreseeable by [the Appellant].").

Although Rosario characterizes the testimony of Rodriguez and Santiago as speaking in "summary generalities," both testified about the specific bases of their knowledge.  Rodriguez stated that he and Rosario, along with the other point owners, talked about the amounts of drugs they sold.  And Santiago, who was also a point owner, explained that he was often at the drug points (which, the court noted, were all located in a relatively small square) and observed sales.  Moreover, the district court had an additional reason to credit Santiago's estimates, viz., Santiago's and Rosario's close working relationship -- they stored drugs together and collaborated on security efforts.

---

[15] The court observed:

I wish to add that there's plenty of evidence in this case that this Defendant handled much more than these quantities, but for purposes of eliminating arguments in the Courts of Appeals, I'm going to use the lowest quantities.  But I want to make a recognition to the United States that they have guided me to parts of the record, that I have corroborated, that would provide a direct handling of quantities much greater than this.

Rosario also argues that the district court erroneously determined that he was a leader of a criminal activity that involved five or more participants or was otherwise extensive. See U.S.S.G. § 3B1.1(a). The court's determination resulted in a four-level increase in Rosario's base offense level. Here again, the court's factual determinations may be disregarded only if clearly erroneous. United States v. Arbour, 559 F.3d 50, 53 (1st Cir. 2009) (finding that defendant was a leader/organizer reviewed for clear error).

"[T]o invoke § 3B1.1(a), a district court must make a finding as to scope -- that the criminal activity involved five or more participants or was otherwise extensive -- and a finding as to status -- that the defendant acted as an organizer and leader of the criminal activity." Arbour, 559 F.3d at 53 (citing United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995)). Both findings must be supported by a preponderance of the evidence. Id.

Rosario challenges only the court's status finding, conceding that the criminal activity at issue here either involved five or more participants or was otherwise extensive. He argues that, at most, the evidence supported a finding that he was a manager or supervisor of a criminal activity, not a leader.

The guideline commentary provides a non-exhaustive list of factors for courts to consider when making the status determination. U.S.S.G. § 3B1.1(a) application note 4. These factors include: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense;

(3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. Id. "There need not be proof of each and every factor before a defendant can be termed an organizer or leader." Tejada-Beltran, 50 F.3d at 111.

Here, the evidence amply supports the district court's status finding. Witnesses testified that Rosario was a point owner who attended meetings where conspiracy matters were discussed and conspiracy-related decisions made. See U.S.S.G. § 3B1.1(a), application note 4 ("exercise of decision-making authority"; "degree of participation in planning or organizing the offense"; "nature of participation in the commission of the offense"). There was also evidence that when Sierra threatened the exclusivity of the drug points belonging to Rosario, Torres and Santiago, Rosario successfully recruited Santiago to join him in confronting Sierra. Id. ("the recruitment of accomplices"). Finally, the government put on evidence indicating that Rosario directly led (as an employer) at least three participants -- Torres, Cheo, and an individual known only as "Predator." Arbour, 559 F.3d at 56 ("[T]he guideline commentary makes plain that a defendant needs only to have led or organized one criminal participant, besides himself of course, to qualify as a leader or organizer under § 3B1.1(a).").

-39-

Rosario's penultimate claim is that the court failed to adequately explain his sentence. United States v. Gall, 128 S. Ct. 586, 597 (2007) (identifying an inadequate explanation as a procedural error). Specifically, he asserts that the court failed to explain whether the sentence reflected the need to provide him with educational or vocational training or other correctional treatment, 18 U.S.C. § 3553(a)(2)(D), and that the court also failed to expressly describe why the shorter sentence requested by Rosario was inadequate to protect the public, id. at § 3553(a)(2)(C).

"A district court's explanation for a chosen sentence must be reasoned and case-specific." United States v. Almenas, 553 F.3d 27, 36 (1st Cir. 2008). The explanation here was both. The court spent some time at sentencing discussing the history and characteristics of the defendant. The judge noted that Rosario grew up without any structure in his life and that there was a history of drug abuse in his family. The judge also discussed Rosario's criminal history, describing his extensive criminal record. After considering the nature and circumstances of the conspiracy offense that Rosario was convicted of, the district court sentenced Rosario to life imprisonment. The judge explained that this sentence reflected the seriousness of the offense and the need to promote respect for the law, to provide just punishment for the offense, and to provide deterrence. Although the court did not explicitly mention every single § 3553(a) factor, the explanation was adequate. See United States v. Dixon, 449 F.3d 194, 205 (1st

Cir. 2006) ("Although the court's explanation must reflect that the court considered the various § 3553(a) factors, the court need not discuss these factors one by one, in some sort of rote incantation when explicating its sentencing decision."); see also United States v. Turbides-Leonardo, 468 F.3d 34, 40 (1st Cir. 2006) (noting that a district court "ordinarily should identify the main factors upon which it relies").

Finally, Rosario claims that his sentence is substantively unreasonable. "Review of substantive reasonableness amounts to review for an abuse of discretion." United States v. Hall, 557 F.3d 15, 22 (1st Cir. 2009).

Rosario argues that the life sentence imposed on him by the district court is unreasonable because it is greater than necessary to accomplish the goals of sentencing. 18 U.S.C. § 3553(a); see also Wallace, 461 F.3d at 30. He submits that, when sentencing him, the district court unduly accounted for his prior criminal record. In particular, Rosario contends that the court's discussion of his past criminal sentences suggests that the court imposed a life sentence on him for the instant offense to compensate for what it perceived were inadequate earlier sentences.

There is no doubt that the court considered Rosario's past criminal conduct when sentencing him in this case. The court specifically focused on Rosario's 1992 offenses, which included the attempted murders of two police officers. But a defendant's criminal history is a relevant factor for a court to consider when arriving at a sentence. 18 U.S.C. § 3553(a)(1).

-41-

Although Rosario claims that the court's focus on the length of the sentences he received for his prior crimes suggests that it was effectively sentencing him again for these crimes, the record supports a different inference. The court observed that after Rosario served a total of six years in prison for his various crimes, he returned to "a life of violence and of severe violations." This suggests that the court thought that Rosario's past sentences had failed to deter him from engaging in criminal conduct. The court was entitled to take this into account when sentencing Rosario for the instant offense. Id. § 3553(a)(2)(c) ("the need for the sentence imposed--to protect the public from further crimes of the defendant").

## 2. **Torres**

Torres was assigned a BOL of 38 based on drug amount. He received a two-level increase for possession of firearms while part of the drug conspiracy, U.S.S.G. § 2D1.1(b)(1), and a two-level adjustment for organizing, leading, managing, or supervising a criminal activity, id. § 3B1.1(c). The resulting total offense level of 42 combined with a criminal history category of II to yield a sentencing range of 360 months to life. The court sentenced him to a non-guidelines sentence of 300 months imprisonment.

The district court found Torres responsible for eighteen kilograms of cocaine, seventy-two kilograms of crack, and between 1,000 and 3,000 kilograms of marijuana. These quantities easily saddled Torres with a base offense level of 38. See U.S.S.G. §

2D1.1(c)(1) (noting that a defendant qualifies for a base offense level of 38 if he is responsible for "1.5 KG or more of Cocaine Base").

The government concedes that the district court erred when finding Torres responsible for 1,000 to 3,000 kilograms of marijuana, admitting that the evidence only supported a finding of 245 kilograms. It argues, however, that the error was harmless because the court's other findings were accurate and qualified Torres for the offense level assigned.

We agree that the error was harmless. The district court's finding that Torres was responsible for seventy-two kilograms of crack cocaine would alone qualify him for an offense level of 38, as only 1.5 kilograms of crack triggers that offense level. Regardless of whether the finding of seventy-two kilograms may be an over-estimate, there is record evidence indicating that Torres was responsible for well over 1.5 kilograms of crack.

At trial, the government elicited testimony from the two cooperating witnesses regarding Torres' drug activity. Rodriguez testified that from 1995 to 1996, Torres cooked approximately a half a kilogram of crack per week for Pomales. In explaining the basis for this knowledge, Rodriguez testified that on several occasions he was present when Torres cooked the crack. Over the course of a year, this would translate into approximately twenty-four kilograms of crack. But there was more. Santiago testified that in 1998, Torres also cooked crack for Rosario. As noted above, the district court found that in that year Rosario sold

approximately a half a kilogram of crack per month (translating into roughly six kilograms of crack that year). Finally, Santiago testified that Torres cooked crack for Luis "Besito" between 1998 and 1999. Besito sold one and a half kilograms of crack per month, which translates, conservatively, into twelve kilograms of crack over the course of a year. Even taking a cautious view of these estimates, a court could find that Torres was responsible for a far greater quantity than the 1.5 kilograms required to trigger a base offense level of 38.

Torres suggests two reasons why he cannot be held responsible for over 1.5 kilograms of crack cocaine. First, he argues that the evidence at trial merely showed that he cooked cocaine into an indeterminate amount of crack. On the contrary, the cooperating witnesses testified to the weight of the crack product that resulted from Torres' cooking. Second, he says that as time went on, his role within the conspiracy shifted from that of a "crack cocaine cooker" to that of a drug point owner. Although that is true -- Torres eventually came to own a marijuana point -- it did not preclude the court from assigning Torres responsibility for his actions as a cooker of crack cocaine.

### 3. **Calderón**

The court assigned Calderón a BOL of 38, which was then increased by two levels for his having possessed firearms while part of the drug conspiracy, U.S.S.G. § 2D1.1(b)(1), and adjusted upward by three levels for his having managed or supervised a criminal activity that had at least five participants or was

otherwise extensive, id. § 3B1.1(c).  The resulting total offense level of 43 combined with a criminal history category of I to yield a sentencing range of 360 months to life.  The court sentenced him to a non-guidelines sentence of 216 months imprisonment.

The district court found that Calderón was responsible for 1.5 kilograms of crack cocaine, concluding that such quantity was foreseeable to Calderón.  Id. § 1B1.3 application note 2 (noting that a drug conspirator is responsible for "all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook").  The record evidence showed that Calderón personally handled marijuana only.

On appeal, Calderón argues that the district court clearly erred in finding that he could reasonably foresee this quantity of crack cocaine.[16]  It is true that the court did not cite, and the government has not identified, a direct link between Calderón and crack distribution.  Neither of the cooperating

---

[16] Arguably, Calderón forfeited this argument below.  When the question of drug quantity initially came up at sentencing, his counsel stated:

> We're sort of -- respectfully I have to say this, but I think we're playing a game because, very simple, if we're going to apply reasonably foreseeable, I think to anybody there it was reasonably foreseeable that other points were operating there, and if all those points are considered all of the same thing, and that they sold crack, you get to 1.5 kilograms of crack very easily, and that puts it at a level 38, so we don't have to fiddle with the record.

Later, when making the quantity determination, the court stated, "It's very easy to get to 1.5 in crack."  Calderón's counsel replied, "I said that in my first sentence, practically."  Nevertheless, as the government defends the district court's quantity determination on the merits, we will address the claim.

witnesses testified that Calderón attended meetings where drug amounts were discussed, nor did they testify that Calderón was physically present in the square when crack was being sold.

That said, we cannot say the district court's finding was clearly erroneous. Calderón was an active point owner in the drug distribution conspiracy for at least three years. Although Calderón himself specialized in marijuana in La Placida during those years, his co-conspirators dealt large quantities of crack in the same square at the same time. Rosario alone, with whom Calderón shared a common marijuana seller named Cheo, operated a drug point in the housing project that sold approximately fifty-four kilograms of crack during the life of the conspiracy. Ultimately, given the staggering amount of crack that was being cooked, packaged, and sold in La Placida during the three years that Calderón was a member of the conspiracy, the sentencing court did not clearly err in finding that Calderón would have reasonably foreseen the 1.5 kilograms of crack the district court assigned to him.

Calderón also argues that his sentence of 216 months imprisonment -- well below the guideline sentencing range applicable to him -- is substantively unreasonable because it was unjustifiably more severe than the sentences imposed on three co-defendants who pled guilty. We disagree. As we have said before, § 3553(a)(6) "aims primarily at the minimization of disparities among defendants nationally." <u>Martin</u>, 520 F.3d at 87. Moreover, the more severe sentence imposed on Calderón was justified because

he and his co-defendants were not similarly situated:  they pled guilty; he went to trial.  There is a "material difference" between defendants who plead guilty and those who elect to go to trial, and any sentencing disparity that results from that difference is not unreasonable.  United States v. Rodriquez-Lozada, 558 F.3d 29, 45 (1st Cir. 2009) (citation omitted).

### 4.  **Pomales**

Pomales' BOL was 38 based on the amount of drugs the court assigned to him, U.S.S.G. § 2D1.1 (2005), and he received a two-level increase for possession of firearms while part of the drug conspiracy, id. § 2D1.1(b)(1), as well as a three-level adjustment for managing or supervising a criminal activity with at least five participants, id. § 3B1.1(b).  The resulting total offense level of 43 combined with a criminal history category of I to yield a sentencing range of 360 months to life.  The court sentenced him to life imprisonment.

Pomales argues that he should have received a two-level reduction in his base offense level for acceptance of responsibility.  Although Pomales denied responsibility for his criminal actions in his pre-sentencing interview, at sentencing he reversed course and expressed remorse for those actions.  Review is again for clear error.  United States v. Garrasteguy, 559 F.3d 34, 38 (1st Cir. 2009) (denial of downward adjustment for acceptance of responsibility reviewed for clear error).

The district court's denial of the requested reduction was not erroneous.  "[D]efendants who proceed to trial and put the

government to its proof normally do not qualify for any reduction for acceptance of responsibility." Id.; see also U.S.S.G. § 3E1.1 application note 2 ("In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.").

Here, the district judge understood that he had the capacity to grant Pomales an acceptance of responsibility reduction despite his decision to proceed to trial. Nevertheless, the judge concluded that Pomales' extensive criminal activity along with the statements he made at his pre-sentencing interview outweighed his expression of contrition at sentencing. See United States v. Deppe, 509 F.3d 54, 60 (1st Cir. 2007) ("Acceptance of responsibility entails more than merely mouthing the vocabulary of contrition."). We discern no error in this conclusion.

Pomales also says that, because the court sentenced him to life imprisonment based on his crack cocaine dealings, he is entitled to a resentencing based on the crack cocaine amendment to the guidelines. In 2007, the United States Sentencing Commission lowered the offense levels associated with crack cocaine offenses, see U.S.S.G. App. C, Amend. 706 (2007), and subsequently issued a declaration of retroactivity with respect to those lowered offense levels. United States v. Ayala-Pizarro, 551 F.3d 84 (1st Cir. 2008).

The remedy for defendants who believe they are entitled to resentencing based on the retroactive amendment is to file a

motion with the district court seeking relief.  <u>See</u> <u>United States</u> v. <u>Chandler</u>, 534 F.3d 45, 51 (1st Cir. 2008).  We thus dismiss this claim by Pomales without prejudice.[17]

### III.  Conclusion

For the reasons provided above, we affirm the convictions and sentences of the appellants.

---

[17] Pomales also makes a general claim that his sentence is unreasonable, he fails to develop the claim any further. Accordingly, it is waived.  <u>See</u> <u>Zannino</u>, 895 F.2d at 17.